**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| XOMA ROYALTY CORPORATION ) | |
| (f/k/a XOMA CORPORATION) ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. _____ |
| v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| JANSSEN BIOTECH, INC. ) | |
| (f/k/a CENTOCOR, INC.) ) | |
| ) | |
| Defendant. | |

## COMPLAINT

Plaintiff XOMA Royalty Corporation, formerly known as XOMA Corporation ("XOMA"), by its undersigned counsel, files this Complaint seeking overdue royalties, monetary damages, and declaratory relief from Janssen Biotech, Inc., formerly known as Centocor, Inc. ("Janssen"). In support of its claims, XOMA alleges the following:

## INTRODUCTION

1.      XOMA's patented technology and research tools known as bacterial cell expression ("BCE Technology") was instrumental to the discovery and isolation of the active ingredient in Tremfya® (guselkumab). Tremfya® is a blockbuster biologic drug developed, commercialized and sold by Janssen for the treatment of patients with moderate to severe plaque psoriasis and active psoriatic arthritis. Since its commercial launch in 2017, Tremfya® has earned Janssen and its affiliates in excess of $14.5 billion in revenues. Janssen also recently obtained FDA approval for Tremfya® directed to new indications to treat moderate to severe active ulcerative colitis and Crohn's disease, which is likely to generate substantial additional revenues for Janssen.

2.     Tremfya® was developed by Janssen utilizing XOMA's BCE Technology.  XOMA licensed that technology to another company, MorphoSys AG ("MorphoSys"), pursuant to a written contract (the "XOMA Master Licensing Agreement").  MorphoSys, in turn licensed the technology to Janssen under a separate license agreement (the "Centocor Agreement") by which MorphoSys also made available to Janssen its proprietary phage display antibody library technology.  As described in more detail below, the antibody library licensed by MorphoSys to Janssen and used to develop Tremfya® could not operate without the use of XOMA's BCE Technology.

3.     Critically, the Centocor Agreement expressly imposed several restrictions upon Janssen's use of XOMA's BCE Technology, including (i) a restriction precluding Janssen from commercializing any products discovered using XOMA's technology absent a separate commercial license from XOMA; and (ii) a covenant not to use any such products for any purpose other than research and development.  The Centocor Agreement also expressly provides that XOMA is an intended third-party beneficiary with respect to Janssen's agreement to abide by these restrictions.

4.     Janssen is in breach of both the Centocor Agreement and its legal obligation to refrain from unjust enrichment.  Janssen never obtained the requisite commercial license from XOMA to commercialize Tremfya®, and has never paid any royalties to XOMA in respect of commercial sales of Tremfya®.  As a consequence, Janssen is liable to XOMA for royalties and monetary damages based on breach of an express contract and, alternatively, unjust enrichment. XOMA also seeks a declaration of the parties' rights and obligations with respect to Janssen's future sales of Tremfya®.

## PARTIES

5.      XOMA is a corporation organized and existing under the law of Nevada with its principal offices at 2200 Powell Street, Suite 310, Emeryville, California 94608.

6.      On information and belief, Janssen is (i) a corporation organized and existing under the laws of Pennsylvania with its principal offices at 800 Ridgeview Dr., Horsham, Pennsylvania 19044; and (ii) now known as Johnson & Johnson Innovative Medicine.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the controversy is between parties that are citizens of different states, and the damages suffered by XOMA as a direct and proximate result of Janssen's conduct exceeds $75,000.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).  Janssen is headquartered in Horsham, Pennsylvania, and a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this District.

9.      This Court has personal jurisdiction over Janssen because it maintains its headquarters and conducts the activities detailed below in this District.

10.     Janssen has agreed not to object to or otherwise challenge personal jurisdiction or forum in this District.

## NATURE OF DISPUTE AND BASIS FOR XOMA'S CLAIMS

### XOMA's BCE Technology and MorphoSys's Antibody Discovery Business

11.     XOMA is one of the oldest and most respected antibody research and development companies in the world.  After XOMA was founded in 1981, its business focused primarily on the identification and development of novel therapeutic proteins, including antibodies and antibody fragments.  Antibodies are proteins produced by the immune system to defend against foreign

substances called antigens.  They act as a "search-and-destroy" force, recognizing and neutralizing threats like viruses, bacteria, and toxins.  Antibodies are crucial for immunity, helping to protect the body from infections.  Antibodies contain "binding" sites that can specifically bind to antigens.

12.    Antibodies may be discovered and made by engineering cells to produce the antibody or antibody fragment of interest.  Many antibodies can be produced in genetically engineered cells derived from animals (*e.g.*, hamsters).  Antibodies can also be made in bacteria cells.

13.    XOMA developed and owns the patent rights to groundbreaking BCE Technology. BCE Technology allowed scientists for the first time in history to produce antibodies and antibody fragments of interest in certain types of bacteria cells.  The technology operates by using certain viral vectors to introduce DNA necessary to produce antibodies of interest into the bacteria cells. The use of this technology is essential to the operation of a particular type of antibody discovery system referred to as a phage display library.

14.    It was generally recognized in the 1990's in the biopharmaceutical industry that a license to XOMA's BCE Technology patent portfolio was necessary to perform phage display. Although XOMA understood that it could take many years to discover and commercialize an antibody using phage display techniques, it recognized the value of the use of such technology. By the mid-1990's, XOMA had an established program pursuant to which it out-licensed the XOMA BCE Technology to third parties as a discovery and production platform for proteins, particularly antibodies and antibody fragments.  By the end of 2002, nearly every major phage display company in Europe and the United States had taken a license to XOMA's BCE Technology.  And, by early 2008, XOMA had granted more than 50 licenses to biotechnology and pharmaceutical companies.

15.    In the early 2000s, as part of its licensing program, XOMA initiated discussions with MorphoSys regarding a potential license to XOMA's BCE Technology patents.  MorphoSys was in the business of discovering antibodies for development as biopharmaceutical products.

16.    MorphoSys desired a license from XOMA so that it could compete with other phage display companies, such as Cambridge Antibody Technology and Dyax, Inc. (each of which took a license to XOMA's BCE Technology), in attracting third parties with whom to collaborate in using its phage display technology to discover antibodies.  At that time, MorphoSys primarily was a service-based company, offering access to its antibody libraries and/or providing antibody discovery services to larger companies (such as Janssen).[1]

17.    MorphoSys's core patented technology is a Human Combinatorial Antibody Library ("HuCAL"), which is a compilation of antibodies that have been synthetically made to mimic human antibodies.  Antibody libraries can encompass hundreds of billions of antibody fragments as well as the genetic information that encodes the antibody binding sites contained in those fragments.

18.    HuCAL antibody libraries are created by using viruses to infect bacteria (known as bacteriophage or "phage") in order to introduce into the bacteria cells a diverse collection of binding elements of an antibody.  XOMA's BCE technology is essential to the use of bacteriophage to introduce antibodies of interest into bacterial cells and enable those cells to then produce, or "express," those antibodies so they then could be tested for binding to particular antigens.

19.    HuCAL antibody libraries consist of antibody fragments (known as "Fabs") that can be screened to find a particular antibody fragment with certain desired features (*i.e.*, binding to a particular antigen).  This fragment is then expressed and secreted in a bacterial cell, enabling

---

[1] In 2024, MorphoSys was acquired by Novartis AG.  *See* Novartis, 2024 Annual Report, available at: https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2024.pdf.

further study of that one particular fragment selected from among the many others in the library. This technology is so important to medical science that the 2018 Nobel Prize in Chemistry was awarded to Sir Gregory Winter for the invention of antibody phage display.

20.    XOMA's BCE Technology is essential to the use of a HuCAL antibody library as an antibody discovery research tool.

- First, the BCE Technology was and is used every time a HuCAL is created or duplicated.

- Second, the BCE Technology is used every time an antibody fragment is fished out of a HuCAL.

- Third, the BCE Technology is used every time an antibody fragment is separated from its phage so that it may be further tested and developed.

- Fourth, in the case of the antibody fragments that became Tremfya®, the BCE Technology is further used to improve or "mature" the fragment after its initial discovery.

21.    XOMA's BCE Technology thus is essential to the HuCAL process for the development of antibodies.  Because MorphoSys (and Janssen) chose to work with bacteria and phage display, XOMA's BCE Technology was necessary to get the antibody fragments (Fabs) on the surface of the phage, an essential step in the antibody selection process.

**XOMA's Licensing of its BCE Technology to MorphoSys**

22.    Research tools, such as XOMA's BCE Technology, regularly are licensed with royalty payments tied to later sales of discovered products.  Such sales typically occur well after the expiration of the research tool patents.  The royalties on those sales are intended to fairly compensate the owner of the research tool patent for use of the patented technology that occurs during the patent term to discover the drug candidate that then is further developed and eventually marketed, after FDA approval, much later.  Such was the case here.

23.     XOMA and MorphoSys entered into the XOMA Master Licensing Agreement, comprising: (i) a License Agreement effective as of February 1, 2002; (ii) an Amendment and Termination Agreement effective as of February 13, 2003; and (iii) a License Agreement effective as of February 13, 2003.  Pursuant to the XOMA Master Licensing Agreement, XOMA licensed MorphoSys to use its patented technology as a research tool to discover antibodies for use as potential therapeutic drug products.  XOMA agreed to provide a license on certain conditions designed to reserve for itself the right and ability to grant direct commercial licenses under the XOMA patent estate to certain classes of MorphoSys' customers or "collaborators."  While XOMA would receive small upfront payments from MorphoSys, the principal value received for the grant of the license rights was the possibility that, once a product discovered using XOMA's patented technology reached the market, XOMA would obtain royalty income and milestone payments from either or both of MorphoSys (if it was the selling entity) or its customers and collaborators (if they were the selling entities).

24.     Without the XOMA Master Licensing Agreement, through which it obtained access to XOMA's BCE Technology, MorphoSys would not have been able to attract customers to work with and grow its business.  Like other phage display companies, a license to the XOMA patent estate was a necessary step for survival.  MorphoSys used XOMA's patented BCE Technology in connection with its HuCALs.  In fact, every step of MorphoSys's antibody discovery process – from the creation of the antibody fragment libraries, the use of those libraries, and the successful isolation and processing of candidates derived from those libraries – relied upon and used XOMA's BCE Technology.  XOMA's BCE Technology enables antibody phage display and is used repetitively throughout the process as it is repeated in a cycle in the search to identify the

most promising antibodies.  Without it, one could neither create the tools needed for, nor practice the methods that comprise, antibody phage display.

25.    In exchange for a broad license to the XOMA patented technology, MorphoSys agreed in the XOMA Master Licensing Agreement to several transfer restrictions relating to antibodies, including information arising from the use of the XOMA patented technology.  The restrictions to which MorphoSys agreed required that MorphoSys obtain agreement of its third-party customers or collaborators, in writing, to (i) engage in only research and development activities related to such antibodies; and (ii) not commercialize any such antibodies without first obtaining commercialization rights directly from XOMA.

26.    The XOMA Master Licensing Agreement explicitly required MorphoSys to (i) include provisions in any contract with any third party restricting their use of products of the XOMA technology to research and development, and naming XOMA as a third-party beneficiary of such provisions; and (ii) provide certain specified notices to potential collaborators or third parties.  Such notices include a redacted copy of the XOMA Master Licensing Agreement itself and a specified form of notice attached thereto.  Section 2.4 of the XOMA Master Licensing Agreement, in relevant part, provides:

> **Transfer Restrictions**.  (a) MORPHOSYS shall not (i) undertake any Antibody Phage Display Activities on behalf of a Third Party or (ii) Dispose of Licensed Antibody Phage Display Materials, a Licensed Immunoglobulin, Licensed Immunoglobulin Information or the product of the practice of any method within the scope of the XOMA Patents ("*Transferred Materials*") to any Third Party until (in the case of either clause (i) or clause (ii)) such time as it has provided to such Third Party the redacted copy of this Agreement referred to Section 4.2 and the form of notice set out at Schedule 2.4.
>
> (b) If MORPHOSYS enters into a written arrangement with any Third Party arising out of or relating to activities as to which it or such Third Party does or intends to claim the benefits of any of the licenses or other grants provided for by this Agreement, such written arrangement shall contain provisions (i) pursuant to which the recipient of any Transferred Materials agrees to abide by each of the limitations, restrictions and other obligations provided for by this Agreement, including,

- 8 -

without limitation, the restrictions on use of Transferred Materials for purposes other than Research and Development; (ii) implementing a covenant not to use Transferred Materials for any purpose other than for Research and Development purposes otherwise authorized by this Agreement; (iii) providing that the "first sale" doctrine does not apply to any Disposition; and (iv) permitting a MORPHOSYS Collaborator to further Dispose of Transferred Materials only to a Third Party who otherwise meets the definition of a MORPHOSYS Collaborator and who executes a written agreement in which it undertakes all of the obligations applied to the transferring party. XOMA shall be, and the agreements subject to this Section 2.4 shall provide that XOMA shall be, an intended third party beneficiary with respect to the foregoing provisions.

**The MorphoSys and Janssen Collaboration (the "Centocor Agreement")**

27.    After executing the XOMA Master Licensing Agreement, MorphoSys proceeded to enter into numerous research collaboration agreements pursuant to which it licensed its proprietary HuCAL technology and XOMA's BCE Technology to its collaboration partners. MorphoSys executed one such agreement with Janssen in 2004:  the Centocor Agreement.

28.    Pursuant to Section 2.4 of the XOMA Master Licensing Agreement, the Centocor Agreement includes a restriction upon commercialization of any product under the XOMA patent rights and expressly incorporates the quoted provisions above from the XLMA. Centocor Agreement, Section 3.8.

29.    The Centocor Agreement expressly includes a restriction on commercialization of antibodies developed pursuant to the XOMA Master Licensing Agreement and names XOMA as an intended third-party beneficiary of such restriction.  *Id.*

**Discovery of Guselkumab Using XOMA's BCE Technology**

30.    MorphoSys and Janssen agreed upon the parameters of a research program directed to the use of HuCAL, and hence XOMA's BCE Technology, to find Fabs to the p19 and p40 subunits of interleukin 23 ("IL-23").  IL-23 is a naturally occurring cytokine involved in normal inflammatory and immune responses.  This program – funded by Janssen – used HuCAL, including XOMA's patented enabling BCE Technology, to discover, isolate and improve the

antibodies now incorporated into Tremfya®. According to an interview of MorphoSys's CEO (Dr. Simon Moroney) and Chief Scientific Officer (Dr. Markus Enzelberger) posted on its website, MorphoSys "started actual work on the IL-23 target for Centocor in the MorphoSys labs" in 2003 and "discovered and optimized the antibody and delivered it to Centocor in 2005" – prior to the expiration of XOMA's antibody secretion patents.[2] That same interview confirms that "[t]he HuCAL antibody library technology was used to generate the guselkumab antibody under license from MorphoSys." Thus, as these statements confirm, XOMA's BCE Technology was used to discover, isolate, and improve the active ingredient in Tremfya® (guselkumab).

31.    By December of 2005, MorphoSys's work had progressed far enough, at least with the p19 subunit, for MorphoSys to grant a further license to Janssen for IL-23; Janssen had two years to decide whether to maintain the license. The antibody binding domains were then "affinity matured" (i.e., further processed to improve their binding characteristics) by MorphoSys using XOMA's patented BCE Technology, and became known as "CNTO1959."

32.    Also in December of 2005, Janssen filed a provisional patent application, naming mainly Janssen employees, covering the antibodies discovered by Janssen that included the particular antibody binding domains discovered using XOMA's BCE Technology. That application became the core for patents covering Tremfya®.

33.    Janssen was under no obligation to do anything with the license to CNTO1959 it was granted. It could have, as it has done with other antibodies discovered using HuCAL, abandoned CNTO1959 at any time. In January of 2007, Janssen paid an additional fee which made its commercial license from MorphoSys irrevocable, but Janssen still was not obligated to develop the antibody and could have abandoned it at any time.

---

[2] Interview with Dr. Simon Moroney from MorphoSys's website.

34.     Thereafter, Janssen moved CNTO1959 through its internal clinical development process.  This is a process as to which MorphoSys was a passive observer.  MorphoSys provided no significant input and no material funding.  On June 29, 2009, MorphoSys issued a press release stating that it had received a milestone payment in respect of CNTO1959.  At each step, however, Janssen had the right to abandon further development of the molecule.

35.     In 2010, with the active part of the relationship long over, Janssen, as it was required to do under the Centocor Agreement, reported to MorphoSys that CNTO1959 had passed initial clinical testing and that a Phase 2 clinical trial would be initiated.  All of these activities were, as defined in the XOMA Master Licensing Agreement, limited to research and development.  On December 8, 2011, MorphoSys issued a press release stating that it had received another milestone payment in respect of CNTO1959.

36.     Research and development of CNTO1959 continued – the outcome of which was not certain – well into 2016.  The CNTO1959 antibody eventually became known as guselkumab.

**Guselkumab Is Approved as Tremfya®**

37.     On July 13, 2017, Janssen announced that the U.S. Food and Drug Administration ("FDA") approved Tremfya®.  Tremfya® is an injectable formulation of an antibody called guselkumab.  Guselkumab is a human monoclonal antibody.  It selectively binds to the p19 subunit of IL-23, primarily through its complementary determining regions, and inhibits its interaction with the IL-23 receptor.  These unique binding features of guselkumab give the antibody its therapeutic effect and were developed using XOMA's BCE Technology.  In particular, because of binding domains discovered using XOMA's technology, guselkumab operates to inhibits the release of proinflammatory cytokines and chemokines implicated in the pathogenesis of psoriasis.

38.     Janssen is the holder of the Biologics Licensing Application for FDA approval of Tremfya® in the United States.  Janssen's patent filings for Tremfya® demonstrate extensive use

of XOMA's BCE Technology.  An affiliate of Janssen made a sworn submission to the United States Patent Office that U.S. Patents Nos. 7,935,344 and 7,993,645 (the "'344 patent" and the "'645 patent") cover the product and received extensions of the terms of those patents on that basis. The '344 and '645 patents both claim priority to U.S. Provisional Patent Application No. 60/754,889.  This application and subsequent issued patents establish that the antibody binding domains in Tremfya® arose out of and are covered by XOMA's patented BCE Technology.

39.    Based on all of the available evidence (including the facts stated herein), the development of Tremfya® was made possible by the extensive and comprehensive use of XOMA's BCE Technology.

40.    Janssen launched commercial sales of Tremfya® in 2017.  Since then, sales have exceeded $14.5 billion.

41.    Although Janssen has paid MorphoSys milestone payments and royalties, Janssen never sought or obtained a commercial license from XOMA, nor has it paid any royalties to XOMA, with respect to sales of Tremfya®.

**PROCEDURAL HISTORY**

42.    XOMA and Janssen entered into a tolling agreement with respect to the claims that are the subject of this Complaint, effective as of January 14, 2020 (the "Tolling Agreement").

43.    Paragraph 1 of the Tolling Agreement provides that "[a]ll statutes of limitation and other defenses arising from the passage of time, including but not limited to, laches, waiver, estoppel … are hereby tolled and suspended from the Effective Date through the duration as described in paragraph 2 below."

44.    Paragraph 2 of the Tolling agreement provides as follows:

Duration.  The tolling and suspension of the statutes of limitation and other defenses from the passage of time, as set forth in paragraph 1, shall terminate upon the earlier of twenty (20) days after either Party gives written notice of termination to the other

or the date XOMA files a complaint in any court or jurisdiction or a demand for arbitration in any jurisdiction raising allegations that Janssen may have breached and/or failed to fulfil its obligations (1) under the Janssen/Morphosys Agreement [the Centocor Agreement], or (2) as a Morphosys Collaborator, to the detriment of XOMA.

45.     By signing the Tolling Agreement, the parties expressly agreed that – if the parties did not resolve their dispute – the next step in the dispute resolution process would be for XOMA to file a complaint or a demand for arbitration, which would terminate the Tolling Agreement.

46.     The Tolling Agreement further provides that: "Neither Party shall argue in any legal or arbitral proceeding that any delay or passage of time that occurred during the term of this Agreement shall prejudice or otherwise be used to the detriment of any other Party."

47.     On June 12, 2025, relying in good faith on an arbitration clause contained in the Centocor Agreement, XOMA filed an arbitration demand against Janssen in the International Centre for Dispute Resolution ("ICDR") and began to diligently pursue that arbitration.  Upon learning that Janssen planned to challenge the ICDR's jurisdiction, and following negotiations by counsel, the parties agreed to litigate this dispute in this forum.  The parties further agreed that the duration of the Tolling Agreement would extend through the date of this Complaint.

## CLAIMS AGAINST JANSSEN

### Count 1 – Breach of Contract

48.     XOMA repeats and realleges herein each of the preceding paragraphs.

49.     The XOMA Master Licensing Agreement and Centocor Agreement are valid and enforceable written agreements supported by sufficient exchanges of consideration.

50.     Pursuant to its contract with Janssen (*i.e.*, the Centocor Agreement), in research commissioned and funded by Janssen, MorphoSys discovered and isolated guselkumab utilizing XOMA's patented BCE Technology and Janssen further developed Tremfya® pursuant to the XOMA Master Licensing Agreement.

51.    In Section 3.8(a) of the Centocor Agreement, Janssen agreed that its rights to use XOMA's protected technology did not include the right to commercialize any products using XOMA's protected technology.

52.    Further, Janssen agreed to abide by certain provisions of the XOMA Master Licensing Agreement and further agreed that XOMA shall be an intended third-party beneficiary with respect to such provisions.

53.    Specifically, Section 2.4(b)(i) of the XOMA Master Licensing Agreement imposed restrictions that "the recipient of any Transferred Materials agrees to abide by each of the limitations, restrictions and other obligations provided for by this Agreement, including, without limitation, the restrictions on use of Transferred Materials for purposes other than Research and Development."  Thus, Janssen was and is precluded from commercializing any Transferred Materials.  Section 2.4(b)(ii) of the XOMA Master Licensing Agreement similarly precludes Janssen from commercializing Transferred Materials.  Specifically, Section 2.4(b)(ii) limits use of Transferred Materials by any Third Party (*i.e.*, Janssen) by making such use subject to a "covenant not to use Transferred Materials for any purpose other than for Research and Development purposes otherwise authorized by this Agreement."

54.    Tremfya® (guselkumab) constitutes Transferred Materials under the XOMA Master Licensing Agreement because it comprises a Licensed Immunoglobulin, as it arose out of the use of antibody phage display (*i.e.*, the use of Licensed Antibody Phage Display Materials), as well as affinity maturation using the BCE Technology:

> "Licensed Antibody Phage Display Materials" means (i) any collection or library of polynucleotide sequences, created by and under the exclusive control of MORPHOSYS, which encodes at least one Immunoglobulin and which is contained in filamentous bacteriophage and/or bacteriophage or phagemid cloning vectors capable of propagation in bacteria; (ii) any collection or library of bacteriophage, created by or under the exclusive control of MORPHOSYS, wherein an Immunoglobulin is (a) expressed as a fusion protein

comprising an Immunoglobulin or at least a functionally operating region of an antibody variable region and an outer surface polypeptide, or a fragment thereof, of a bacteriophage or (b) expressed separately and linked to an outer surface polypeptide, or a fragment thereof, of a bacteriophage; or (iii) any material required to generate any collection or library according to (i) and/or (ii), each of which under (i), (ii) and/or (iii) infringe, but for the license granted herein, the XOMA Patent Rights. . . .

"Licensed Immunoglobulin" means any Immunoglobulin discovered, isolated or characterized by MORPHOSYS or a MORPHOSYS Collaborator (as defined below) through the use of Licensed Antibody Phage Display Materials.

"Licensed Immunoglobulin Information" means any data, know-how or other information relating, concerning or pertaining to a Product, including, without limitation, data, know-how or other information characterizing or constituting such Licensed Immunoglobulin's polynucleotide or amino acid sequence, purported function or utility, antigen binding affinity, or physical or biochemical property.

…

["Transferred Materials" means] Licensed Antibody Phage Display Materials, a Licensed Immunoglobulin, Licensed Immunoglobulin Information or the product of the practice of any method within the scope of the XOMA Patents . . . .

§§ 1.7-1.9; 2.4(a).  The amino acid sequence which forms the binding domains constitutes Licensed Immunoglobulin Information, as do all the pre-clinical results arising therefrom such as binding and activity data.  All of these also meet the definition of "Transferred Materials."

55.    By engaging in the conduct described herein, Janssen breached its contractual obligations to XOMA.

56.    Janssen breached Section 2.4(b)(i) of the XOMA Master Licensing Agreement, as incorporated in Section 3.8(a) of the Centocor Agreement, when it made commercial sales of Tremfya®, *i.e.*, used "Transferred Materials for purposes other than for Research and Development."

57.    Janssen breached Section 2.4(b)(ii) of the XOMA Master Licensing Agreement, as incorporated in Section 3.8(a) of the Centocor Agreement, by using Transferred Materials for any

purpose other than for Research and Development purposes otherwise authorized by the Agreement.

58.    On information and belief, Janssen breached Section 2.4(b)(iv) of the XOMA Master Licensing Agreement, as incorporated in Section 3.8(a) of the Centocor Agreement, by allowing its affiliates (including Janssen-Cilag Pty Ltd. and Janssen-Cilag International NV) to manufacture and/or sell Tremfya® without obtaining a written agreement from each of them undertaking all of the obligations that apply to Janssen itself under the Centocor Agreement and the XOMA Master Licensing Agreement.

59.    By reason of Janssen's breaches, XOMA has been damaged, and is entitled to royalties and compensatory damages in an amount to be determined by the Court and/or a jury.

## Count 2 – Unjust Enrichment

60.    XOMA repeats and realleges herein each of the preceding paragraphs.

61.    In the alternative to Count 1, if the Court determines that XOMA and Janssen do not have an enforceable contract covering the subject matter of this dispute, XOMA is entitled to recover under the doctrine of unjust enrichment.

62.    XOMA conferred benefits on Janssen by allowing Janssen (and its agent, MorphoSys) to use XOMA's BCE Technology.

63.    Janssen benefited as a result of using XOMA's BCE Technology, which allowed Janssen (and its agent, MorphoSys) to discover and improve Tremfya®.  Janssen has benefited from revenues from commercial sales of Tremfya® without obtaining a commercial license from XOMA or paying royalties to XOMA.

64.    XOMA did not agree to provide its BCE Technology to Janssen gratuitously. Janssen was aware that XOMA was providing the benefit and expected to be paid for it, including from a commercial license and royalties as reflected in the Centocor Agreement and related

provisions of the XOMA Master Licensing Agreement, which Janssen acknowledged by signing the Centocor Agreement.

65.     Janssen has failed to pay XOMA for the reasonable value of the benefit conferred.

66.     It would be inequitable to allow Janssen to retain the benefits conferred by XOMA without paying for their value, in that XOMA expected payment for conferring the benefit and has not received it.

67.     As a result of Janssen's refusal to pay XOMA for the reasonable value of the benefits provided, Janssen has been unjustly enriched at XOMA's expense.

68.     As restitution, XOMA is entitled to a judgment in its favor directing Janssen to make payment to XOMA for the reasonable value of the benefit provided, in an amount to be determined by the Court and/or a jury, plus interests, costs, and expenses.

### Count 3 – Declaratory Relief

69.     XOMA repeats and realleges herein each of the preceding paragraphs.

70.     Declaratory relief is authorized by 28 U.S.C. §§ 2201(a) and 2202.

71.     There is an actual justiciable controversy between XOMA and Janssen pertaining to XOMA's entitlement to royalties as respects ongoing sales of Tremfya® by Janssen, and a judicial declaration is necessary and appropriate so that XOMA may ascertain its rights.

### JURY DEMAND

XOMA hereby demands a jury trial pursuant to Fed. R. Civ. P. 38(b) of all issues so triable.

### RELIEF SOUGHT

**WHEREFORE,** XOMA respectfully requests the following relief:

A.     Judgment in favor of XOMA and against Janssen;

B.      Royalties, restitution, damages or other monetary relief, including pre-judgment and post-judgment interest, in an amount to be determined by the Court and/or a jury in respect of royalties on Janssen's and its affiliates' prior net sales of Tremfya®;

C.      A declaration that Janssen is in breach of the Centocor Agreement and will owe XOMA royalties in respect of future net sales of Tremfya® by Janssen and its affiliates at a rate to be determined by the Court and/or a jury;

D.      A declaration that Janssen has been unjustly enriched and will owe XOMA royalties in respect of future net sales of Tremfya® by Janssen and its affiliates at a rate to be determined by the Court and/or a jury; and

F.      Such other and further relief as the Court may deem just and proper.

Dated: August 5, 2025

XOMA ROYALTY CORPORATION,

By its counsel,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By:   */s/ John S. Summers*
      John S. Summers (Pa. ID 41854)
      A. Kyle Victor (Pa. ID 333192)
One Logan Square, 27th Floor
Philadelphia, PA 19103
jsummers@hangley.com
kvictor@hangley.com
(215) 568-6200


*./s/ Eric J. Marandett*
Eric J. Marandett (BBO# 561730)
emarandett@choate.com
G. Mark Edgarton (BBO# 657593)
gedgarton@choate.com
Natalia Smychkovich (BBO# 699289)
nsmychkovich@choate.com
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA  02110
Tel.: (617) 248-5000
Fax: (617) 248-4000

(applications for *pro hac* admissions
forthcoming)