```
                   UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA


Xoma Royalty Corporation,     .  Civil Action No.
                              .  25-cv-04484
          Plaintiff,          .
                              .  Courtroom 13A
V                             .  U.S. Courthouse
                              .  601 Market Street
Janssen Biotech, Inc.,        .  Philadelphia, PA  19106
                              .
          Defendant.          .  November 10, 2025
                              .  10:41 a.m.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .



                   TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE JOEL H. SLOMSKY
               UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

For the Plaintiff:  DEREK H. FARQUHAR, ESQ.
                    ERIC J. MARANDETT, ESQ.
                    G. MARK EDGARTON, ESQ.
                    Choate, Hall & Stewart, LLP
                    Two International Place
                    Boston, MA  02110
                    (617) 248-5287
                    dfarquhar@choate.com

                    JOHN S. SUMMERS, ESQ.
                    Hangley Aronchick Segal & Pudlin
                    One Logan Square, 27th Floor
                    Philadelphia, PA  19103
                    (215) 496-7007
                    jsummers@hangley.com
```

```
For the Defendant:   ADEEL A. MANGI, ESQ.
                     MUHAMMAD U. FARIDI, ESQ.
                     SARAH HARDTKE, ESQ.
                     Linklaters LLP
                     1290 6th Avenue
                     New York, NY  10104
                     (212) 903-9314
                     muhammad.faridi@linklaters.com

                     MICHAEL R. McDONALD, Paralegal
                     Ballard Spahr, LLP
                     1735 Market Street, 48th Floor
                     Philadelphia, PA  19103
                     (215) 864-8463
                     burket@ballardspahr.com

Audio Operator:      Richard C. Thieme

Transcribed by:      Diversified Reporting Services, Inc.


          Proceedings recorded by electronic sound recording,
            transcript produced by transcription service.
```

```
 1              THE COURT:  Please be seated.
 2              This is the case of Xoma Royalty Corporation
 3    versus Janssen Biotech, Inc., Civil Action number 25-4489,
 4    on behalf.
 5              On behalf of the Plaintiff, we have Derek Farquhar
 6    here.  I hope I'm pronouncing the name right.  Eric
 7    Marandett, Esquire?
 8              MR. MARANDETT:  Yes, Your Honor.
 9              THE COURT:  Welcome.  Mark Edgarton, Esquire
10              MR. EDGARTON:  Good morning.
11              THE COURT:  Welcome.  And John Summers, Esquire
12              MR. SUMMERS:  Good morning, Your Honor.
13              THE COURT:  Welcome.
14              And on behalf of the Defendants, we have Adeel
15    Mangi, Esquire.
16              MR. MANGI:  Mangi, Your Honor.  Good morning.
17              THE COURT:  Good morning.  Michael McDonald,
18    Esquire.
19              MR. McDONALD:  Yes, Your Honor.  Good morning.
20              THE COURT:  Muhammad Faridi, Esquire.
21              MR. FARIDI:  Good morning, Your Honor.
22              THE COURT:  Welcome.  And Sarah Hardtke, Esquire.
23              MS. HARDTKE:  Good morning, Your Honor.
24              THE COURT:  Welcome.
25              And there's also a paralegal or two here.  Not
```

1    sure.  It's hard for me to read the name.  But is it Jane,
2    Eileen, something like that?

3              MS. EBERSOLE:  Janine Ebersole.

4              THE COURT:  All right, could somebody put her name
5    on the record?  Somebody say her name for the record.  Yes,
6    speak into the mic.  You've got to speak into a mic.

7              MR. McDONALD:  Yes, Your Honor.  Michael McDonald
8    for the Defendant, Janine Ebersole, E-b-e-r-s-o-l-e, as a
9    paralegal.

10             THE COURT:  All right, okay.  Thank you.

11             We're here because some motions have been filed.
12   And everyone has to speak into a microphone, so pull up the
13   microphone so we can hear everyone.

14             And my review of the docket indicates that there
15   are three open motions.  There's a motion to dismiss the
16   complaint, which is document number 10 in the record.  And I
17   have read that and the memorandum of law in support of it,
18   which is document number 17.  The Plaintiffs filed a
19   response to the motion.  The memorandum is number 36, which
20   I have read.  And there is a reply, which is document number
21   44 filed by the Defendant.  And I have read all those.

22             We do have a motion, document number 41, which is
23   a motion to seal Defendant's reply memorandum of law in
24   support of the motion to dismiss.  Is there any objection to
25   that, counsel?

1              MR. FARQUHAR:  No, Your Honor.

2              THE COURT:  All right, then that motion will be

3    granted, and we'll enter an order.

4              And the third motion, which we'll get to later

5    also, is Defendant's motion to stay discovery, document 11.

6    The reply memorandum in opposition is document number 37.

7    And there is a -- well, the responsive memorandum is 37.

8    That's from the Plaintiff in opposition.  And the reply is

9    document 43.  So those are the motions that are open.

10             And I have read all the materials I've referred

11   to.  And I've looked at some of these agreements and

12   exhibits.  I can't say I read every word of them.  They're

13   quite extensive.  But it's Defendant's motion to dismiss.

14   So why don't I hear from the Defendant?

15             MR. MANGI:  Your Honor, we have a slide deck.  I

16   have a hard copy that may help you out.  Your Honor, may I

17   approach?

18             THE COURT:  Yes.

19             MR. MANGI:  Your Honor, Adeel Mangi from

20   Linklaters for Janssen Biotech.

21             So, Your Honor, as you know, the Plaintiff Xoma,

22   has brought this case seeking royalties relating to

23   Janssen's sales of a drug that is sold under the name

24   Tremfya.

25             THE COURT:  Yes.  I should also put on the record

1   I read the amended complaint again.

2           MR. MANGI:  Okay, great.  Thank you, Your Honor.

3           So as Your Honor probably saw there, Tremfya was

4   launched in 2017.  It's a blockbuster drug.  It treats

5   various immune conditions such as plaque psoriasis and so

6   on.  And of course, as Your Honor also saw there, Xoma is

7   suing under a third party beneficiary theory relating to a

8   contract between Janssen and a third party that is called

9   MorphoSys.

10          Now, Your Honor, by the end of my argument today,

11  I hope to have convinced you of two things.  First that,

12  while as Your Honor pointed out, there are a lengthy set of

13  contracts here, this motion to dismiss is actually quite

14  simple.  And the provisions that we rely on are discrete and

15  likewise very simple and straightforward.

16          Second, I hope to show Your Honor that this is

17  actually quite an unusual posture for a motion and a set of

18  contracts.  And it's unusual for this reason.  At the time

19  that the original contracts were being entered into, Xoma

20  created a document, and that document was intended to

21  summarize, highlight, and explain the critical provisions of

22  the agreements.  Because it was intended to be a notice for

23  parties like Janssen that later got involved in this.

24          THE COURT:  That is the attachment?

25          MR. MANGI:  That is the Schedule 2.4.

1              So this is not a case, Your Honor, where we have

2    to go searching through some record for the contemporaneous

3    understanding.  It is written out in a document that at the

4    time Xoma said here is what it all means, and then they made

5    it part of the contracts at issue.  So it's here before you

6    on this motion.  Simple and unusual for those two reasons.

7              Now, Your Honor, let me turn to our specific

8    arguments.  Looking at the next slide, Your Honor, you will

9    see we have five different arguments here, all of which in

10   our view are independent but complementary and lead

11   ultimately to the same pathway, which is the dismissal of

12   this complaint.

13             Let me start with the first one that you see on

14   the slide there, which is that the contract expressly allows

15   for commercialization.  And I'll explain what this means in

16   the context of the contracts in a moment.  But let me just

17   begin with what are the positions that the parties have put

18   in front of you.

19             So let me show Your Honor first Xoma's position.

20   This is from page 1 of their opposition to our motion.  And

21   as you'll see, they say Janssen, that's us, needed to come

22   to Xoma to get a commercial license in order to

23   commercialize.  In other words, we're not allowed to

24   commercialize, we're not permitted to, unless separate and

25   apart from the contracts at issue, we came to them and got a

1    separate commercialization license.

2          Contrast that, Your Honor, with the position we

3    have set forth also in our briefing at 3.  We have said the

4    agreements expressly authorize Janssen to commercialize

5    antibody products.  And there's only one qualification

6    there.  So long as Janssen does not produce commercial

7    quantities using a method that infringes on their patents.

8          Now, this, Your Honor, is the fundamental question

9    that Your Honor will have to grapple with on this motion to

10   dismiss.  You have two completely contrasting views of the

11   world as to whether or not Janssen is permitted to

12   commercialize.  And I would submit Your Honor will have to

13   look to the contracts for the answer.  Who's right?  Because

14   both of them can't be right.  They are completely opposite.

15         THE COURT:  And if both of them could be right,

16   I'm going to have to look at the language at least at the

17   motion to dismiss stage and the atmosphere of both to Xoma.

18         MR. MANGI:  And that's fine, Your Honor.  But I

19   submit that when you do that against the language of the

20   contracts that I'll show you in a moment, there's only one

21   answer.

22         THE COURT:  All right.  Based upon what I've read,

23   it looks to me like Xoma's business model is to use their --

24   what they created, their bacteria cell expression, to

25   license that, if I'm using the right word, to a company like

1    MorphoSys, which is what is being called a UCAL library of

2    bacteria to try to isolate the antibodies that can be the

3    subject of an agreement between another company like Janssen

4    to create a drug that's beneficial to humankind.

5            If that's the case, wouldn't Xoma want

6    commercialization?  They'd want to get a piece of the

7    action, so to speak.

8            MR. MANGI:  Well, the -- the --

9            THE COURT:  In other words, do research and

10   development if you want.  But if you create something, give

11   us a piece of the action.

12           MR. MANGI:  Well, the answer to that, Your Honor,

13   lies in the structure of the contracts.  And the way in

14   which Janssen -- now, remember, they're a vendor to a

15   vendor.  We're dealing with MorphoSys.  And when MorphoSys

16   brought us this technology, MorphoSys arranged in their

17   contract, as I'll show you in a moment, for a very detailed

18   structure whereby, if the drug was commercialized, MorphoSys

19   would get royalties pursuant to a very deliberately and

20   carefully laid out structure.

21           Now, if the vendor to the vendor, the tool

22   provider, essentially, Xoma, if they wanted a piece of the

23   action, to borrow your phrase, the way they would do that is

24   by arranging their dealings with MorphoSys appropriately in

25   order to get that.  They here thought they had done that.

1    And so they went and they sued MorphoSys.  And they had a
2    long arbitral process with MorphoSys.
3            But when it comes to us, Janssen, what they
4    provided to us, what they told us when we entered into a
5    deal with MorphoSys, was that you are permitted to
6    commercialize.  The only thing you can't do is use our
7    patents for commercial production.  Other than that,
8    everything is between them and MorphoSys.
9            In fact, our agreement with MorphoSys says
10   explicitly, Your Honor, in Section 5.8, that if there are
11   any royalties owed to Xoma from any of this, MorphoSys owes
12   them, not us.
13           THE COURT:  If that's the case, why was the master
14   license agreement attached to the Centocor agreement?  And
15   you were given -- you had knowledge of it.
16           MR. MANGI:  Because, Your Honor, there are
17   restrictions on what we can do that come in from that
18   agreement.  And they relate in particular to this issue of
19   commercial production and what is allowed and what is not
20   allowed in relation to Xoma's patents that we are being
21   permitted to use.  And I'll show you those precise
22   provisions in a moment.
23           THE COURT:  Okay.
24           MR. MANGI:  Okay.  All right.  So here are the two
25   views of the contracts.

1          Let me go to the contracts themselves.  Now I'll

2    do this briefly because I think it's fair, Your Honor is

3    familiar with these documents.  But the two basic agreements

4    here, Your Honor, this is important to the question you were

5    just raising.

6          MorphoSys, they're the ones with the library.  And

7    they wanted, apparently, per the pleading, to use Xoma's BCE

8    technology as a tool, as essentially a photocopier to help

9    MorphoSys make copies of antibodies of interest.  So they

10   entered into this agreement with MorphoSys whereby MorphoSys

11   could use their technology.  And MorphoSys could use their

12   technology when working with drug companies as

13   collaborators, like us.

14         Separately we, Centocor, which is a predecessor

15   entity, but Janssen for present purposes, Janssen then

16   entered into a contract with MorphoSys.  And we said, okay,

17   MorphoSys, we want to use your library to help develop a

18   potential drug.  And how do we get access to it?  This is

19   the arrangement that they made.  Okay.  So these are the two

20   key contracts.

21         Here, Your Honor, now is where the Schedule 2.4

22   comes in.  Because in that MorphoSys Xoma license agreement

23   when they entered into that, they anticipated that MorphoSys

24   would work with companies like Janssen.  And they said,

25   okay, if you're going to do that, then you, MorphoSys, need

1    to give Janssen a copy of Schedule 2.4 so they are on notice

2    as to what exactly Xoma's rights are, what is permitted, and

3    what is not permitted.  So that's part of that agreement.

4    It was given to us.  It's also made part of the second

5    agreement, which is our agreement between Janssen and

6    MorphoSys.

7            So the Schedule 2.4, Your Honor, is the beating

8    heart of all of these deals, because it explains Xoma's view

9    of what Janssen was permitted to do, and Xoma's view of what

10   Janssen was not permitted to do.

11           And by the way, Your Honor, I am going to call out

12   the key provisions of that on the slide so it's available to

13   you.  But we also attached that schedule as an appendix to

14   our reply brief, so you don't have to go searching through

15   the papers for it.

16           All right.  Now, let me turn Your Honor to just

17   show you the grounding first of where that schedule is

18   referenced.  So in the MorphoSys Xoma agreement, Section 2.4

19   that you will see on the screen there now, and I will pull

20   out the key section of it, 2.4 which everyone has been

21   talking about, transfer restrictions, you will see at the

22   end it makes clear that MorphoSys is not to go work with any

23   third party unless they have given them Schedule 2.4, so

24   that Janssen is on notice as to what Xoma claims as its

25   rights.

1          So then, Your Honor, let me now turn in some

2    detail to Schedule 2.4 itself.  And I am going to pull up on

3    the screen the key bullet points one by one so Your Honor

4    can see them in all of their context.

5          So Your Honor will see it says under the license

6    agreement with Xoma, and then we start going through the

7    provisions.

8          First one, Your Honor, just says in a very

9    straightforward way, Xoma can't work with you, Janssen, the

10   third party, unless they have first given you a copy of the

11   license and this notice.  So that's Schedule 2.4.  We're on

12   slide 5 here, Your Honor.

13         Then it gets to the substance.  Here is the first

14   key bullet point of substance, Your Honor.  It says -- and

15   remember "you" here is Janssen, the third party drug

16   company.  It says, if you and MorphoSys enter into a written

17   agreement by which you, Janssen, become a MorphoSys

18   collaborator, then you, Janssen, will be permitted to use

19   MorphoSys phage display, phage display materials, products,

20   and information -- that's what they claim they have some

21   right to -- you will be permitted to use those materials to

22   research, develop -- and this is critical, Your Honor -- and

23   commercialize antibody products.

24         This is not something we wrote.  This is something

25   Xoma wrote.  And they then gave it to us as a notice at the

1  outset to make sure we understood what was permitted and not

2  permitted.  And it says Janssen will be permitted to

3  commercialize.  But it doesn't stop there, Your Honor.  The

4  very next bullet point then provides further context.

5           Collaborators, Janssen --

6           THE COURT:  Let me ask you one question.

7           MR. MANGI:  Yes.

8           THE COURT:  When I look at the license agreement,

9  this is between Xoma Ireland Limited and MorphoSys.  And in

10 some ways in your memorandum of law, you're saying these

11 plaintiffs don't have standing because they're not Xoma

12 Ireland Limited.  But you're relying upon this contract.

13          MR. MANGI:  Yes.  Your Honor, so --

14          THE COURT:  Are you abandoning your other

15 argument?

16          MR. MANGI:  No, no, no.  I'm actually going to get

17 to it in a moment.  And I will get to that.  It's in our

18 briefing.  It's in our reply brief.  And it's here in my

19 deck as well.

20          The reason I put Schedule 2.4 first, Your Honor,

21 is because I think it is the simplest answer to all of this,

22 the simplest pathway for Your Honor.  No issues of law, no

23 fights about any cases.  It's very straightforward.  One

24 party says you can't commercialize, the other says I can.

25 And the contract says you will be permitted to

```
1   commercialize.  So I put it straight up there because it's
2   simple  But the standing issue is number one in our moving
3   papers.
4            THE COURT:  Okay.
5            MR. MANGI:  Okay.  So let me go to the second
6   bullet, Your Honor.  So the first one has made clear Janssen
7   will be permitted to commercialize.  Then the second bullet
8   says collaborators, Janssen, do not however -- and that
9   however I underline, Your Honor, it's important because it
10  shows they are not talking about a restriction on the right
11  that was set out in the prior paragraph.  You have a right
12  to commercialize, however Janssen does not have the right to
13  produce commercial quantities of such antibodies using
14  Xoma's patented technology.
15           And let me pause here, Your Honor, to make one
16  factual observation that is undisputed.  When Janssen
17  produces Tremfya commercially for use in the marketplace,
18  there is no use, no touching, on their technology.  Because
19  their technology involves bacterial cells.  Tremfya is
20  produced commercially using mammalian cells.  It's a
21  completely different technology.
22           So there is no dispute that we do not use Xoma's
23  patented technology in commercial production of Tremfya.
24           THE COURT:  But you do use the -- the antibodies
25  that have been given to you by MorphoSys.
```

```
1              MR. MANGI:  Yes.
2              THE COURT:  Which is sourced, has been extracted
3   or expressed, which is sourced from the Xoma technology,
4   patented technology.
5              MR. MANGI:  Well, the answer to that, Your Honor,
6   is the trail of development in the early 2000s does start
7   with a process with MorphoSys helping identify antibodies of
8   interest that, according to them, did use Xoma's technology.
9   And then there was a 15-year plus development process that
10  Janssen went on.  Eventually they got to commercial
11  production using a completely different methodology.
12             THE COURT:  My concern is --
13             MR. MANGI:  Yes.
14             THE COURT:  -- that when it says using the
15  patented technology, you know, I don't know the business
16  model.  I don't know -- not the business model so much --
17  but any other patented products other than the bacterial
18  cell expression that Xoma has created.  Are you saying this
19  relates to any other, or does it relate to the BCE, this
20  language?
21             MR. MANGI:  Which language, Your Honor?  The
22  patented technology?
23             THE COURT:  Patented technology.
24             MR. MANGI:  Yeah, this is referring only to their
25  patent families that involved the BCE technology.  That is
```

1    all we are talking about here today.

2            They have no claim, patent claim or otherwise, to

3    anything we're doing in commercial production.  They have

4    never brought a patent infringement case.  There is no

5    suggestion that our commercial production methods touch in

6    any way on their technology.  They're only making assertions

7    about what happened between them and MorphoSys in the early

8    2000s.  It is undisputed that our commercial production does

9    not touch in any way on their patents.  Okay?

10           THE COURT:  Okay.

11           MR. MANGI:  Okay?  So let me suggest also, Your

12   Honor, that when you're thinking through that issue, it's

13   very important to look at both the first bullet I have on

14   the screen there and the second, and to look at them

15   together.  Why?  Because the first one says you will be

16   permitted to commercialize.  So when it comes to the

17   question, Your Honor, of, well, yeah, they were involved

18   early on.  You know, they contributed something to

19   MorphoSys, apparently.  Doesn't that mean that you can't go

20   on and commercialize without giving them a slice of the

21   action?  No.  Because the contract tells you right here

22   Janssen will be permitted to commercialize.  So there is no

23   question that we're allowed to take that and go on and

24   commercialize per that, the second bullet actually on the

25   screen from Section 2.4.

1          And then the third bullet on the screen there,
2     Your Honor, sets out that limitation.  Yes, you can go ahead
3     and commercialize.  But here's the one thing you can't do if
4     you commercialize.  You can't engage in commercial
5     production using Xoma's patents.  There's no dispute that we
6     don't do that.
7          And then it goes on, Your Honor.  And the next few
8     sentences make the context even more clear.  It says
9     collaborators -- rather collaborators, Janssen, only have
10    the right to make research and development quantities of
11    antibodies using Xoma's patent rights.  Thereafter -- so now
12    in the post-R&D phase -- unless the collaborator obtains a
13    commercial production license from Xoma, which may be
14    available, the collaborator, i.e. Janssen, must produce
15    commercial quantities of antibodies using a method that does
16    not infringe Xoma patent rights.  And that, Your Honor, is
17    exactly, precisely what Janssen has done here.
18         So to give Your Honor the context here, Janssen
19    has given the notice written by Xoma saying you will be
20    permitted to commercialize.  The only thing you can't do is
21    commercial production using our patented technology.  If you
22    do that, you might need another license.  But short of that,
23    you can go ahead and produce commercial quantities using a
24    different method that doesn't touch on our patents.  That's
25    what they told us the requirements were, and we did exactly

1  that, a hundred percent.  And here we are now being sued

2  over it.

3          That's why I say, Your Honor, simple.  Because

4  they say you can't commercialize.  The contract says exactly

5  the opposite.

6          And then it goes on and makes clear, yeah, you

7  know, take the rest of the contract, look at it, too.  But

8  this is the most important stuff.  Not according to us,

9  according to them at the time of the agreement.

10         So that, Your Honor, is Schedule 2.4.

11         Let me go back to what I showed you a moment ago,

12  just so now you can look at it in the context of Schedule

13  2.4.  Xoma's position.  Janssen needed to come to Xoma to

14  get a commercial license in order to commercialize.  That is

15  the polar opposite of what Schedule 2.4 says, as I just

16  showed you.

17         Now, let me make clear, Your Honor, that while

18  Schedule 2.4 is the most important part of these agreements,

19  because it's their contemporaneous expression of what was

20  most important and what it all meant, there are other

21  provisions of the contract that say exactly the same thing.

22         Let me draw your attention now, Your Honor, on the

23  screen to Section 2.3.  So Schedule 2.4 teed off from

24  Section 2.4.  This is the immediately prior section.  This

25  is the Xoma MorphoSys agreement, Section 2.4 -- Section 2.3.

1    And this is the section that talks about no implied rights.

2    And it talks about only the rights and licenses granted

3    shall have legal force and effect.  No others shall be

4    deemed to have been granted.

5           But then, at the end of the provision, in the

6    highlighted language you'll note, Your Honor, it says for

7    the avoidance of doubt, so now let's avoid any future

8    disputes, the grants of rights made pursuant to these

9    sections do not include and expressly exclude the following.

10   And what's excluded?  Exactly what Schedule 2.4 said, any

11   right to have made any amount other than research quantities

12   or otherwise as authorized, et cetera, by practicing Xoma's

13   patent rights.  So just like Schedule 2.4 said, here's the

14   one thing you can't do.  You can't produce commercial

15   quantities using their patent rights.

16          And then, Your Honor, critically, there is a

17   further clarification, so that no one has to get up in court

18   20 years later and argue about it.  Here is what it said.

19   Provided however that MorphoSys or, as applicable, a

20   MorphoSys collaborator, meaning Janssen, shall be permitted

21   to make or have made any product by any means of its

22   selection, other than those which otherwise infringe a valid

23   claim of the Xoma patent rights.  So we can commercially

24   produce in any way we want if we're not infringing on their

25   patent rights.  Exactly what Schedule 2.4 said is here,

1  right there in the plain text of Section 2.3 of the Xoma

2  MorphoSys contract.

3         But it's not the only one, Your Honor.  Let me

4  also draw your attention to Section 2.2 of the same

5  agreement.

6         So Section 2.2 is entitled Covenant not to Sue.

7  And it says, Your Honor, that the covenant not to sue -- and

8  it said in there that Xoma covenants -- it shall not assert

9  or permit any third party to enforce the patent rights or

10 claim of infringement against MorphoSys or a MorphoSys

11 collaborator like Janssen, and it goes on from there.  But

12 then it provides this key point.  The covenant not to sue

13 provided in the Section 2.2, subpart little one, shall not

14 extend to infringement of the Xoma patent rights arising out

15 of making or the means or methods used to make any amount of

16 licensed immunoglobulinal product other than the research

17 quantities.  So again, this is making the exact same point

18 that you saw in Schedule 2.4, in Section 2.3, and in section

19 2.2.

20        So then, Your Honor, let me turn to what are

21 Xoma's responses to this very simple and straightforward

22 language.  You will see that in their opposition brief,

23 first they point to Section 3.8 of the MorphoSys Centocor

24 agreement.  And the provision they're referring to there is

25 one I'm calling up on the screen, which says that the

```
 1    benefits of the Xoma covenant shall be personal to Centocor.
 2    That's Janssen for present purposes, and its affiliates --
 3              THE COURT:  Let me ask before you go on --
 4              MR. MANGI:  Yes.
 5              THE COURT:  What does 2.2 small one mean to you?
 6              MR. MANGI:  Section 2.2, Your Honor, is Xoma --
 7              THE COURT:  The covenant not to sue, it has a --
 8    it has an exception.
 9              MR. MANGI:  Yeah, this is Xoma saying, we're
10    granting a covenant not to sue so MorphoSys or Janssen
11    collaborators, you can use our patent rights, but they're
12    making very clear that this covenant not to sue doesn't
13    apply and we do reserve the right to sue you if you start
14    using our patented technology for commercial production.
15    It's exactly what's in Schedule 2.4.
16              Because they're talking about making these
17    products, other than the research quantity.  So other than
18    the research quantities, what's going to come later?  It's
19    the commercial quantities.  So that's what they're saying.
20    If you use our patent, if you use their BCE --
21              THE COURT:  Let's read it together.
22              MR. MANGI:  Sure.
23              THE COURT:  It says, shall not extend to
24    infringement of the Xoma patent rights arising out of making
25    or the means or methods used to make any amount of licensed
```

 1   immunoglobulin product other than research quantities,
 2   except as authorized by Section 2.1.f.  So doesn't this mean
 3   that the covenant not to sue does not apply to any of the
 4   immuno- -- it's hard to pronounce these words unless you're
 5   an expert -- immunoglobulin, which is what I'm assuming is
 6   manufactured or made by MorphoSys, using the Xoma patent
 7   rights.  And if you send that to a collaborator, the
 8   collaborator has to make sure they're not in violation of
 9   this agreement.
10           MR. MANGI:  So, you know, let me draw your
11   attention to two key parts of that language --
12           THE COURT:  Did I interpret that correctly?
13           MR. MANGI:  No, you read it correctly.  But here
14   are the two key parts of it.  First is, when it says other
15   than research quantities.  Right?  So there are going to be
16   research quantities right at the beginning.  Everyone
17   understands that.  But eventually, you're going to get to
18   commercial production.  So that is what they're talking
19   about here.  When they say other than research quantities,
20   they're talking about commercial production.
21           And what they're saying is our covenant not to sue
22   shall not extend to infringement of the Xoma patent rights
23   arising out of -- that's the language in the first sentence
24   of subpart one that's on the screen -- arising out of
25   commercial production.

1          And there are two key points to know about that
2   commercial production, Your Honor.  First, as I pointed out
3   earlier, our commercial production does not implicate the
4   Xoma patent rights in any way, because we're using a
5   completely separate technology.  And, two, they have never
6   sued us for patent infringement.  If we did, they would have
7   done that.  But they haven't, because I think they recognize
8   the same point and there's no dispute about that.

9          So the mere fact, Your Honor, that their
10  technology was used in the early 2000s in the research
11  process to help identify the antibody originally of
12  interest, that is not what is implicated here in any way.
13  And you know that because they are saying, other than
14  research quantities.  So they are setting aside the research
15  quantities.  And then they are talking about patent rights
16  implicated by the later steps, which is the commercial
17  production.

18         And the explanation for that in plain English, so
19  that there is no doubt about it, is Schedule 2.4, which says
20  exactly what I've just said.  Which is, yeah, you know, this
21  stuff originally comes out of the MorphoSys UCAL library.
22  But what is Janssen allowed to do in the future?  You can do
23  research; you can do development.  You will be permitted to
24  commercialize.

25         So that permitted to commercialize language, Your

1  Honor, there is no way of reading that other than the fact
2  that notwithstanding that this originally came out of
3  MorphoSys library that Xoma, it says, had some input to,
4  notwithstanding that, you are permitted to commercialize.
5  That is not a part of your commercialization.  The only
6  thing you can't do is in commercial production, you can't
7  use their patented technology.  In other words, you cannot
8  commercially produce using Xoma's BCE technology.  And we
9  don't.
10          So that's Section 2.2.  Let me return to their
11  arguments.
12          So their argument first based on Section 3.8 of
13  the MorphoSys Centocor agreement, they say the benefits of
14  the covenant not to sue shall not include the right to
15  commercialize any products under Xoma's patent rights.
16  Exact same issue that we've been talking about.  The
17  document says we're permitted to commercialize, but we can't
18  engage in commercial production using their patents and we
19  don't.  No dispute about that.  They never sued us for
20  patent infringement.
21          Then, Your Honor, they point to Section 2.4.b of
22  the Xoma MorphoSys agreement.  And here again, remember it's
23  called Schedule 2.4 because it explains what Section 2.4
24  means.  And it's black and white.  We've just been through
25  that in great detail.

1          But let me point out a few quick hits on this

2    section before I move on.  First is, Your Honor will note

3    that the restrictions here are all defined in terms of the

4    phrase transferred materials.

5          THE COURT:  Let me ask a question.  And I have

6    attempted to read as much of what you're putting on the

7    screen as I can --

8          MR. MANGI:  Sure.

9          THE COURT:  -- beforehand.  You know, and you have

10   agreements with these many terms, using these many

11   provisions, sometimes there might be a conflict in language.

12         And I'm looking at the Schedule 2.4, right?

13         MR. MANGI:  Yes.

14         THE COURT:  I'm looking at the fourth bullet.

15   Therefore, if you and MorphoSys enter into a written

16   agreement, that agreement must contain certain provisions

17   specified in the license agreement with Xoma, including --

18   and I'm looking at the second bullet -- covenant not to use

19   transferred material for any purpose other than -- other

20   than for research and development purposes otherwise

21   authorized by the license agreement with Xoma.

22         MR. MANGI:  Yes.

23         THE COURT:  Doesn't say commercialization.

24         MR. MANGI:  So let me give you first, Your Honor,

25   the legal principle and then the exact explanation on that

1  point.

2           So first, the legal principle, Your Honor, of

3  course, is the Court should endeavor to read all of the

4  provisions of the contract as consistent, cohesive, and

5  complementary, if at all possible.  And here, Schedule 2.4,

6  it said, you know, just two bullets above, everything I just

7  took Your Honor through in great detail.  So the question

8  becomes is there a way to read these things that is

9  consistent?  you know, or is this contract just flatly

10 contradictory in a way that the Court can't possibly

11 reconcile?

12          I would submit to Your Honor it is entirely

13 consistent.  And let me tell you why.  This bullet that you

14 are just pointing to in Schedule 2.4, that is citing to

15 certain language that comes from Section 2.4.b of the

16 agreement.  Right?  And remember, this schedule is

17 explaining all of that.

18          Now, Section 2.4.b of the -- this is the MorphoSys

19 Xoma agreement, right?  That actually is the exact provision

20 that I have on the screen right now.  And I'd like to point

21 out to Your Honor a few key characteristics of that.  Does

22 Your Honor have it?

23          THE COURT:  Yes.

24          MR. MANGI:  Okay.  So we're in part b.  And I'll

25 underline it in red on the screen so Your Honor can see

1    where it is, and then you'll see it in the document, too.

2    You'll see all the restrictions there are phrased in terms

3    of this category, transferred materials.  Right?  And I'll

4    get to this a little bit later.  But when you trace through

5    what is a transferred material, it actually does not apply

6    here at all.

7            And these are the restrictions that that bullet

8    Your Honor was just pointing to are invoking.  So

9    transferred materials doesn't even apply here.  So this

10   subpart of the agreement is not applicable, and I will

11   explain the reasons why in a moment.

12           But let me point to two other features here that

13   do matter.  First is, you'll see underlined there the very

14   first three lines of Section 2.4.b.  If MorphoSys enters

15   into a written agreement with any third party, Janssen,

16   arising out of or relating to activities as to which it

17   grants such third party, as other which or such third party,

18   Janssen, does or intends to claim the benefits of any of the

19   licenses or other grants provided for by this agreement.

20           Now, why is that important, Your Honor?  That is

21   important because that is setting the context.  All of these

22   agreements, Your Honor, are about the terms under which the

23   parties can use Xoma's patented technology.  It's their

24   patent rights.  Like what are the licenses to their patent

25   rights?  But that is the feeling of the rights that they

1   have.

2           And so all the restrictions here in 2.4 are

3   phrased in terms of if you're using their patent rights,

4   here are the restrictions on it.  They can't impose

5   restrictions on us if their patent rights aren't implicated.

6   That would get into patent misuse and other things.  But

7   it's phrased here clearly in terms of those patent rights.

8   And when it comes to the commercial production piece of

9   this, we're not using their patent rights.

10          And you'll see it's also -- this is the other bit

11  in red that I'm just flashing on the screen there -- they

12  say that this all relates to the limitations, restrictions,

13  and other obligations provided for by this agreement.  And

14  it talks later on about any purpose other than for research

15  and development purposes otherwise authorized by this

16  agreement.

17          So it is expressly referencing the larger context

18  of the agreement, which includes Section 2.3, it includes

19  Section 2.2.  And what do those provisions say?  Well, Your

20  Honor, I just showed you Section 2.3 a moment ago that says

21  explicitly we are permitted to engage in commercial

22  production as long as we're not using the patent rights.

23          THE COURT:  This is saying you can't use

24  transferred materials for any purpose other than for

25  research and development purposes.

```
 1              MR. MANGI:  That is the language in the contract,
 2    Your Honor.  But, number one --
 3              THE COURT:  I mean, you can have provisions that
 4    say you can use it for research and development and
 5    commercialization.  But if you -- but if you're going to use
 6    it for commercialization, you better be aware of these other
 7    provisions.
 8              MR. MANGI:  Sure.  But there are a few key points
 9    here, Your Honor.  Number one, as Your Honor just pointed
10    out, transferred materials.  Right?  It's phrased in terms
11    of transferred materials, which does not apply here, for a
12    reason I will get to in a moment.  But then beyond that --
13              THE COURT:  But now I read about that in your
14    memorandum.  And you're getting to what we would call
15    another carveout in the agreement.  Go ahead.
16              MR. MANGI:  Well, I won't call it a carveout, Your
17    Honor, so much as a what does the agreement actually apply
18    to.  That's really our focus here.  And, yes, it does say
19    research and development.  It doesn't include the word
20    "commercialize" there.  But it does elsewhere in the
21    contract.  That's the key point, Your Honor.
22              And you can look at that and say, well, does this
23    make the contract completely contradictory?  But, no, as a
24    matter of law, it doesn't.  It does elsewhere in the
25    contract.  That's the key point, Your Honor.
```

```
 1                And you can look at that and say, well, you know,
 2   does this make the contract completely contradictory?  But,
 3   no, as a matter of law it doesn't, when there is a pathway
 4   that reconciles all of these provisions --
 5                THE COURT:  If you look at 2.4 --
 6                MR. MANGI:  Yes.
 7                THE COURT:  -- it says, transfer restrictions,
 8   right?  And in effect it says, and I think we can agree, go
 9   to the form notice set out in Schedule 2.4.
10                MR. MANGI:  I'm sorry, Your Honor, could you say
11   that again?
12                THE COURT:  Go to the form notice set out in
13   Schedule 2.4.
14                MR. MANGI:  Yes.
15                THE COURT:  You better not do what's in here,
16   unless you read 2.4.
17                MR. MANGI:  Sure.
18                THE COURT:  If you go to 2.4, it had that one
19   second bullet point that I showed you.
20                MR. MANGI:  Yeah.
21                THE COURT:  And you're saying to me it goes back
22   -- that bullet point goes back to b.
23                MR. MANGI:  Yeah.
24                THE COURT:  And b is saying that -- tell me where
25   I'm wrong -- that if you as a collaborator of MorphoSys do
```

```
 1    execute a written agreement in which you -- in which it
 2    undertakes all of the obligations applied to the
 3    transferring party, then Xoma shall be an intended
 4    beneficiary with respect to the foregone provisions.
 5              Now, it seems to say in this provision you can
 6    only use the antibodies sourced from the use of the
 7    bacterial cell expression or the -- or that process of Xoma
 8    for research and development.  You're expanding it now to
 9    cover commercialization.  Is the word commercialization used
10    in paragraph b?
11              MR. MANGI:  So, Your Honor, the word
12    commercialization is not there in b.  But it is there in
13    Schedule 2.4.  And I would suggest to Your Honor it is
14    certainly implicit in those first three lines which make
15    clear in section b that all we're talking about here are
16    their patent rights.
17              So if we are engaged in commercial production that
18    doesn't involve their patent rights, none of this is even in
19    play.
20              Now, Your Honor, I think there's one key principle
21    though that I must emphasize here, which is when we're
22    dealing with these type of commercial drug development
23    contracts, it's almost impossible to fit everything into one
24    sentence, right, or one subpart.  So it's very critical to
25    read these things in context.
```

1          When you do that, Your Honor, there is a section
2    here that is pointing to a schedule that lays it all out
3    together.  And then there's Section 2.3 that I pointed to a
4    moment ago.  I put it back up on the screen here as well.

5          Under -- under the concern Your Honor has, what
6    Your Honor is concerned about is does 2.4.b mean you can
7    only do research and development, you cannot commercialize?
8    Right?  And let me assume for the moment, Your Honor, we're
9    going to put on blinkers and ignore the fact that Schedule
10   2.4 says commercialize.  Right?  But let's assume we ignore
11   that for the moment.

12         Section 2.3 says at the end, provided, however,
13   Janssen shall be permitted to make or have made any product
14   by any means of its selection, other than those that
15   infringe on their patents.  That, there's no way to read
16   that other than outside of this use of their patent rights
17   in research, once you're doing something on your own, you
18   can make it any way you want.  It says you shall be
19   permitted to do it.

20         So there is no way to read that, Your Honor, other
21   than as consistent with Schedule 2.4.  And when it's in
22   black and white in Schedule 2.4, and it's in black and white
23   in Section 2.3, I would submit Your Honor must read Section
24   2.4.b in that context and read all of these things together
25   to understand what was it that the parties were -- what was

1    their deal.

2            And let me say this, Your Honor.  If in Schedule

3    2.4, Xoma intended to say, referring to Section 2.4.b that

4    we just talked about, all you can do is research and develop

5    and you're not permitted to do anything beyond that because

6    somehow we were involved in the initial identification of an

7    antibody, if that's what they intended at the time, Your

8    Honor, there is no sane lawyer in the universe that would

9    then have them agree to the notice that says you shall be

10   permitted to commercialize.  Or to the next bullet that

11   says, and then you can produce any way you want, so long as

12   it's not using the patent rights.  You will be permitted to

13   produce commercially any way you want.  And no sane lawyer

14   would agree to Section 2.3, which says Janssen shall be

15   permitted to make or have made by any means of its

16   selection.

17           So, Your Honor, you've got to read these things

18   together and in context.  And there's only one way to do

19   that.

20           THE COURT:  But Janssen is not a party other this

21   master license agreement.

22           MR. MANGI:  That is true.  We were given this

23   notice, Schedule 2.4, and then we --

24           THE COURT:  And the master license agreement.

25           MR. MANGI:  Yes.  We were given a redacted copy.

```
 1              THE COURT:  It's all part of it.  It's all part of
 2     it.
 3              MR. MANGI:  Yes, it was appended to our agreement
 4     with MorphoSys.
 5              THE COURT:  I'm going to look at this closely.
 6     And, obviously, I'm going to hear from the other side.  But
 7     what I'm sort of seeing here is -- and I'm saying sort of
 8     seeing because you've got to reread these paragraphs
 9     numerous times.  I've been in these contract disputes
10     before.
11              MR. MANGI:  Yeah.
12              THE COURT:  Not often, in the 17 years I've been
13     here, but I've seen a number of them.
14              MR. MANGI:  Sure.
15              THE COURT:  You've really got to dig deep.
16              I'm just getting the sense that, yes, Xoma allows
17     you to do, as a collaborator, do research and development
18     with an antibody that has been expressed through their
19     patented technology.  But if you're going to do anything
20     beyond -- I mean, you can commercialize.  But if you are
21     going to commercialize, you better come back and make an
22     agreement with us because that's the terms under which we've
23     done business with MorphoSys.  And doesn't b say that,
24     2.4.b?
25              MR. MANGI:  I'd submit it does not, Your Honor.
```

1   And the answer to that, as Your Honor goes back and looks
2   over these materials to assess that question, I would submit
3   the answer to that lies in looking at sequentially the
4   bullets that are in Schedule 2.4.  Because it's really the
5   interplay of the second and the third bullets that are on
6   the screen there that provides the answer to your question.
7            And remember, not our document.  Their document.
8   Right?
9            So first it says we shall be permitted to
10  commercialize.  It doesn't say, you know, oh, well, if
11  you're going to commercialize, come back and you're going to
12  have to get a commercial license from us.  It says the
13  opposite.  Section 2.3 says exactly the same thing.  Doesn't
14  say come and get a commercial license; it says, you shall be
15  permitted to produce through any means that doesn't involve
16  their patent rights.
17           So that, you know, in and of itself is black and
18  white.  It's irreconcilable with the notion that all we can
19  do is research and development, we need a license for
20  anything else.
21           And the key point then, Your Honor, the interplay
22  point that I just pointed to, so just look at that bullet,
23  the second one on the screen now, in context with the one
24  that follows and the however.  Because it's making clear
25  what's the contraction on that right.  And the contraction

1    on that right is exactly what I just said.  You can't use

2    their technology in commercial production.  If you do that,

3    it goes on and says you will need a commercial production

4    license.

5            THE COURT:  I think -- I think there is no dispute

6    that Janssen is not using the patented technology for

7    commercial production.

8            MR. MANGI:  Yes.

9            THE COURT:  It all flows back to this licensing

10   agreement.  So I don't think there's any dispute on that.  I

11   know I raised it earlier.  I was curious.  But I don't think

12   there is a dispute on it.

13           MR. MANGI:  No, no, that's fine.  But that's the

14   key point, Your Honor.  The key point from the contract

15   perspective is what it's making clear is when do you need a

16   license.  It tells you in Schedule 2.4.  It says a

17   commercial production license may be available and come back

18   and get it if you're going to use our patent rights.  But

19   otherwise, when it talks about production not using their

20   patent rights, it says it shall be permitted.

21   Commercialization, it says, it shall be permitted.

22           THE COURT:  Let's assume Schedule 2.4 is a form of

23   notice.  Is it part of the contract?

24           MR. MANGI:  Absolutely, Your Honor.

25           THE COURT:  All right.  Because it's set forth in

```
1    the contract?
2            MR. MANGI:  It's set forth in the contract --
3            THE COURT:  What if there is some discrepancy
4    between 2.4, the schedule, and 2.4 in the mutual licensing
5    agreement?
6            MR. MANGI:  So two points, Your Honor.  First, in
7    these deals, the schedules are often the most important
8    part.  You know, they often lay out what drugs are at issue,
9    what products are at issue.  They are at the heart of the
10   agreement.
11           And here, it's in my view the most important part
12   because it's their contemporaneous expression.  That's point
13   number one.
14           Point number two, I think before getting to the
15   notion of, well, is there a conflict between these, the
16   Section 2.4 and the Schedule 2.4, I would suggest, Your
17   Honor, that the legal question is, is there a way to read
18   these things as consistent?  And, you know, ordinarily
19   arguments about, well, can they be consistent, they sort of
20   floated in the ether.  You know, someone suggests, Your
21   Honor, here is a way you can reconcile all of this.
22              But here, they're telling you how to
23   reconcile all of it, at the time of the contract in Schedule
24   2.4.  That's why I say it's unusual, because it's
25   particularly compelling in that circumstance.
```

```
 1              THE COURT:  All right.
 2              MR. MANGI:  All right, so let me speed forward
 3    then, Your Honor.
 4              THE COURT:  I didn't want to slow you down.  You
 5    have a considerable amount of material in here.
 6              MR. MANGI:  Yes, yes, yes, yes.  Well, if I'm
 7    trying your patience, let me know.  Otherwise, I'll keep
 8    going.
 9              THE COURT:  No, no, no, no.  No, no, no.  Go
10    ahead.
11              MR. MANGI:  Thank you.
12              All right, so let me go to another response they
13    made to you, which is they said, well, you should look at
14    industry practices here.  And I would submit, Your Honor,
15    part of the reason they are going beyond the language of the
16    contract is because of precisely the issues with Schedule
17    2.4 and Section 2.3.
18              But they point to this one case, it's discussed
19    extensively in their briefing, the Aries Trading case.  And
20    this is one thing I wanted to point out to Your Honor about
21    that case.  If you look at the structure of the deal there,
22    as we lay out in this little chart here, you will see
23    there's Aries, which is a drug manufacturer like us, there's
24    Dyax, which is a phage display company, which is like
25    MorphoSys.  And then you've got Cat, the tool supplier,
```

1    which is like Xoma.

2          And in that situation, the arrangement was the

3    drug company is going to pay royalties to the MorphoSys

4    entity that's providing the library.  And the MorphoSys

5    entity is going to take care of whatever needs taken care of

6    with the tool supplier, the Xoma.  Right?  And that's again

7    getting to the point of what's their business model?  Are

8    they entitled to a slice of the pie?  If they're entitled to

9    anything, it's from MorphoSys, not from us.  That's why they

10   spent the last few years suing MorphoSys.  And the contract,

11   Your Honor, tells you that.

12          And I put up on screen now Section 5.8 from the

13   MorphoSys Centocor agreement.  And that says on the very

14   first line, MorphoSys will be responsible for license fees

15   and milestones and royalty payments owed to Xoma Ireland.

16   So again, Your Honor, this is all going to the question of

17   does this all make sense, can you read it all consistently.

18   Yes, absolutely.  Because if they have a remedy, it's up to

19   them to arrange it appropriately in their dealings with

20   MorphoSys.

21          All we, Janssen, know is we entered into an

22   agreement where we were told you're permitted to

23   commercialize, you're permitted to produce in any way that

24   doesn't implicate their patent rights, and it says right

25   there in our agreement, it's not our responsibility to deal

1    with Xoma; it's MorphoSys's responsibility.  Anything owed

2    to Xoma is owed by MorphoSys.  That's exactly the same

3    structure in the Aries Trading case.

4            THE COURT:  I think the Aries trading case you

5    highlighted in your reply brief to a large extent.

6            MR. MANGI:  Yes, indeed.  So I'll touch briefly on

7    this, Your Honor.  Through a course of dealing issues,

8    they're arguing a 2007 agreement should be relevant to

9    course of dealing.  The law is clear, has to be previous

10   conduct, and that you can't use that to get around the parol

11   evidence rule.  That's clear from the Foster case and the

12   provisions that I have on the screen there in slide 12.

13           Okay.  So then let's go to this issue, Your Honor,

14   the next one, about transfer restrictions.  This is our

15   second argument from the schematic that I showed Your Honor

16   at the beginning.  Okay?

17           And here again, Your Honor, now we're talking

18   about that very same section, Section 2.4.b.  So everything

19   here, Your Honor, as you see is phrased in terms of

20   restrictions on transferred materials and the use of

21   transferred materials and how you use them and what you do

22   with them.  Right?

23           So the question becomes what is a transferred

24   material?  And the answer to that is in the immediately

25   preceding subsection, Subsection 2.4.a, subpart 2.  And what

1    it says there, Your Honor, is -- you see the definition of

2    transferred materials is at the end of it.  And it says,

3    dispose of these various categories that Xoma says

4    implicates their patent rights.

5          So transferred materials means you're engaging in

6    a disposal of these various categories or any other method

7    within the scope of Xoma patents.  That's what a transferred

8    material is.

9          Now, what Xoma says here, Your Honor, is, no, no,

10   you've just got to ignore the word "dispose of," and that's

11   not part of the definition of a transferred material.  But

12   clearly is for two reasons.  One, when you look at the

13   phrasing of it, that is the provision that the definition is

14   referring to.  And second, as an entirely logical matter,

15   the definition, the use of the phrase "transferred

16   materials," "transferred," that, Your Honor, implicates a

17   notion of a movement or a conveyance from one to another.

18   And the only way you get to transfer is if it's being

19   disposed of.  That is the link to movement or conveyance.

20         THE COURT:  Is transferred materials defined in

21   the agreement?  I know you're putting the definition up of

22   transferred materials.  Is it defined anywhere?

23         MR. MANGI:  This is the definition, Your Honor.

24   And they agree with that.  We are just debating what it

25   means.

```
 1              THE COURT:  A would also -- I mean 1 would also
 2  be, would it not?
 3              MR. MANGI:  I'm sorry, Your Honor.  I didn't
 4  follow.
 5              THE COURT:  Or a is an or.  The first part before
 6  the or would also be transferred materials.  There's an or
 7  in the middle of the sentence.
 8              MR. MANGI:  Which sentence are you referring to,
 9  Your Honor?
10              THE COURT:  2.4, transfer materials --
11              MR. MANGI:  Yeah.
12              THE COURT:  A, officer shall -- shall not -- I'm
13  sorry, it's 1.
14              MR. MANGI:  Right.
15              THE COURT:  Undertake any antibody activities on
16  behalf of third party, or, 2, dispose of --
17              MR. MANGI:  Yes.
18              THE COURT:  Right?
19              MR. MANGI:  Yes.
20              THE COURT:  So transferred would relate to the 2.
21              MR. MANGI:  Yes, yes.
22              THE COURT:  Not the 1?
23              MR. MANGI:  Yes.
24              THE COURT:  Okay.
25              MR. MANGI:  Okay.  So then the question becomes,
```

1    okay, so dispose is clearly related to transferred because
2    there's a notion of a conveyance or a movement.  So what
3    does dispose mean?  And that is defined in the contract,
4    Your Honor.  I've put that up on the screen now.  It's
5    Section 1.5.  And it says very deliberate language here,
6    Your Honor.  Dispose means to transfer, assign, lease, or in
7    any other fashion dispose of control, ownership, or
8    possession, but shall not mean license or sell.
9            So when they're talking about a disposition or
10   disposing that triggers the definition of a transferred
11   material, this is the key qualification.  It only means a
12   transfer or conveyance of a certain kind.  And it excludes a
13   license.
14           Now, then the question obviously becomes, well,
15   how did Janssen get these rights?  In other words, did we
16   get them in a way that activates transferred materials, or
17   in a way that does not?  And the answer to that, Your Honor,
18   comes from their own complaint.
19           Here is Xoma's complaint, paragraph 31.  It's on
20   slide 15 here, pointing out that MorphoSys granted a license
21   to Janssen.  That's how we got access to this, through a
22   license.  So this is just straightforward, one contractual
23   definition to the other.  The restrictions on transferred
24   materials, they simply don't apply.  And you get there
25   through the contractual definitions and their own complaint.

1          And by the way, Your Honor, their reasons why all

2    of this makes sense in the context of the agreements,

3    because they were getting a share in MorphoSys, they were

4    getting shares in MorphoSys, through their own dealings with

5    MorphoSys.  So they could be content for certain types of

6    transactions to occur.  But they limited their rights very

7    specifically.

8          That's why transferred materials, that whole

9    section that Your Honor was focusing on, it doesn't even

10   come into play.  That's why I said at the beginning, these

11   arguments are independent, but they are also complementary.

12         What are their responses to this?

13         THE COURT:  Wait, wait.  Go back to that again.

14         MR. MANGI:  This one?

15         THE COURT:  Yeah.  Dispose means, and then it

16   says, disposition shall have the correlative meaning --

17         MR. MANGI:  Yeah, correlative meaning, meaning you

18   can use disposed or disposition.  We're not going to fight

19   about tenses.

20         THE COURT:  All right.

21         I'm going back to 2.4 now.  Again, I've got to

22   keep rereading these things.

23         MR. MANGI:  No, no, that's fine.

24         THE COURT:  But it says transferred materials in

25   -- something is in a parenthetical.

1          MR. MANGI:  Let me help you with that, Your Honor,

2     a little bit.  So on 2.4.a, right, you'll see that what it's

3     triggering is actually in the last two sentences, which is

4     you can't do these various things unless you've given

5     Janssen a copy of the agreement and Schedule 2.4.  That's

6     what --

7          THE COURT:  It looks like the parenthetical after

8     transferred materials, the -- it may be inserted

9     inadvertently.  Transferred materials to any third party

10    until in the case of either clause one, small I, or clause

11    two --

12         MR. MANGI:  Yeah.

13         THE COURT:  Such time -- until such time --

14         MR. MANGI:  I don't think there's anything

15    inadvertent there, Your Honor, because the parentheticals

16    are around transferred materials, just showing that that's

17    where it's defined.  And it's also underlined for the same

18    reason.

19         THE COURT:  You have the red circle around the

20    first parenthetical.

21         MR. MANGI:  Oh, it's hiding it, yeah.  Sorry about

22    that.  There you go, now you can see it.

23         THE COURT:  It's a little hard to see.  Transfer

24    material to any third party --

25         MR. MANGI:  I took them off on the screen version,

1    if that helps.

2              THE COURT:  I understand.

3              MR. MANGI:  Yeah.

4              THE COURT:  Until, in the case of either clause

5    one or clause two, such time as it has provided to such

6    third party the redacted copy of this agreement referred to

7    in Section 4.2, and the form of notice laid out in Schedule

8    2.4.

9              MR. MANGI:  Right.

10             THE COURT:  All right, so you're focusing on the

11   words "disposed of."  Go ahead.

12             MR. MANGI:  Yeah.  So 2.4.a matters only because

13   it's setting up that definition and disposed of is what

14   gives you the conveyance.  And once you go through the

15   definition of disposed of, it's clear that the restrictions

16   which in substance are set out in subpart b, they don't

17   trigger, because you're not talking about a transferred

18   material in the first place.

19             Okay.  So then, Your Honor, let me move forward.

20   So what does Xoma have to say to that?  And basically their

21   whole argument on this, Your Honor, comes down to playing

22   with tenses.

23             And they just say, well, if you take it out, if

24   you put that meaning in place of the defined clause, or if

25   you replace the substance with the defined clause, it

1    doesn't make sense.  It makes perfect sense.  We set that

2    out in our reply brief.

3            And as you see on the slide here, for example,

4    what does it become?  It becomes MorphoSys shall not

5    transfer materials to any third party when you do this

6    collapsing, expanding exercise.  Nothing illogical about any

7    of this.  It's just a matter of making the tenses, which is

8    entirely appropriate.

9            THE COURT:  Okay.

10           MR. MANGI:  Okay.  So let me then go to the next

11   issue, Your Honor, our third key issue.  And by the way, the

12   last two, I'm going to do very, very briefly.

13           So the first one, the contractual limitation on

14   liability, our third independent argument here.  So, Your

15   Honor, let me draw your attention now to our agreement with

16   MorphoSys, Janssen's agreement with MorphoSys, Section 2.4.

17   And as you see on the screen there, we had an all caps

18   limitation of liability provision, make sure no one misses

19   it.  And it says neither party will be liable -- doesn't say

20   -- doesn't say will be liable to each other -- it just says

21   neither party will be liable, in the abstract, with respect

22   to any subject matter of disagreement under any contract,

23   negligence, strict liability, other legal or equitable

24   theory, for any -- and then it includes various types of

25   damages.  Among them, indirect, consequential, and lost

1    profits.

2              THE COURT:  And now Xoma is not a party to this

3    contract.

4              MR. MANGI:  Not a party to this contract.

5              But here are some key issues here.  First, Xoma is

6    here suing as a third party beneficiary of this contract.

7    Right?  This is what they're suing under.  And you see that

8    from paragraph 29 of their complaint that I have on screen.

9    They are saying that Centocor MorphoSys agreement names them

10   as a third party beneficiary of a particular provision, and

11   that's the basis for their lawsuit.

12             So what their argument here, Your Honor, is that,

13   well, we're a beneficiary of one part -- one paragraph of

14   the Janssen or Centocor MorphoSys agreement, but we didn't

15   agree to be bound by the limitation on liability.  That's

16   the argument that they're making.  They're saying we're only

17   tied into, we only have rights tying to this agreement from

18   that one provision that set out transfer restrictions are

19   going to be applied here.

20             But the law is to the contrary, Your Honor.  So

21   here are a couple of cases on your screen that are in our

22   papers.  But let me just take the first one, Alpine Ocean.

23   It says even if Alpine was a third party beneficiary of the

24   contract, it would still be subject to the limitation on

25   liability clause because a third party beneficiary takes no

1  greater rights than the original contracting party.

2          And remember, Your Honor, under our agreement, we

3  said neither party will be liable for any of these things.

4  And we didn't limit it to just against MorphoSys.  We're

5  saying the subject matter of the contract, that's entirely

6  consistent with this case law saying, if you're suing as a

7  third party beneficiary, you've got to take the limitation

8  of liability provision as a restriction on your rights

9  because you can't be in a better position.

10         THE COURT:  I understand your position.

11         MR. MANGI:  Okay.  And then let me point out, Your

12  Honor, that before we ended up here in front of Your Honor,

13  Xoma had sought to arbitrate this dispute.  And when they

14  sought to arbitrate it, they invoked another provision of

15  the MorphoSys Centocor agreement, Appendix 10.14, that

16  talked about the parties, and the parties' dispute

17  resolution provision.  There was an arbitration provision

18  there that they sought to invoke.  So when it's convenient

19  for them, they certainly think the other provisions of the

20  agreement apply as well.

21         Now, substance.  What they're seeking are

22  royalties.  You see that in the very first line of their

23  complaint.  Right?  Xoma files this complaint seeking

24  overdue royalties.  And then they go on and talk about

25  monetary damages, but their damages are the royalties.

1          So are these royalties implicated by this

2     limitation of liability provision?  Let me point out, Your

3     Honor, there are certainly cases, we've given you one

4     example here, pointing out how when you're talking about an

5     underlying contract that is not an agreement agreeing to pay

6     you royalties, but your remedy is somehow in royalties based

7     on some other theory, that becomes consequential damages.

8     And the Commonwealth Department case that is cited there,

9     and Blankenship, this is saying the same thing.  Blankenship

10    was a case about a manuscript by an author that had been

11    destroyed by a publishing agent, and he sued and he said my

12    remedy should be royalties.  And the court says royalties

13    are going to be consequential damages.  Which is, the put

14    there is if they can satisfy the certain requirements.

15         And that makes sense, Your Honor, as a matter of

16    logic.  Because if you look at the Jay Jolla case, this

17    actually lays out the logic on this, which is very

18    intuitive.  I'm sure it's familiar to Your Honor, which is

19    direct damages are if I have an agreement with you and it

20    provides for a certain thing, then if I don't give you that

21    thing, okay, you can sue me.  And that's direct damages.

22    Right?  But if it's something beyond that, then it's

23    consequential.  And Jay Jolla, this Court said direct

24    damages refers to those which the party lost from the

25    contract itself.  In other words, the benefit of the

1  bargain, while consequential damages refers to economic harm

2  beyond the immediate scope of the contract.

3          THE COURT:  This is all well briefed.

4          MR. MANGI:  Okay --

5          THE COURT:  I don't mean to cut you off, but I

6  have to leave at 12:45.

7          MR. MANGI:  Got it, Your Honor.  So let me then

8  skip through a few points very quickly and I'll wind up.

9          So on the immediate scope, I just want to point

10  out one practical fact for Your Honor, that I redacted on

11  the box there on the screen the numbers in the royalties

12  that we had to pay MorphoSys.  And the key point here, Your

13  Honor, is when we want to have an agreement with a party

14  like MorphoSys that says if we commercialize this, you're

15  going to be entitled to a share of it, we laid out as any

16  sane pharmaceutical company would in great detail what the

17  structure of those royalties will be.  It'll be this

18  percentage if that happens, and it goes on for pages and

19  pages.

20          What would be insane for any pharmaceutical

21  company would be to say, okay, I'm going to spend 15 years

22  developing this.  If I get it approved by the FDA, then you

23  can come to me with no structure, no restrictions, and

24  demand whatever royalty you want, otherwise I won't be

25  allowed to launch my drug.  You can come in and demand a 99

1  percent royalty if you want.  That would make no commercial

2  sense.

3          And yet they are suggesting that is what was

4  intended and agreed to here.  That is the opposite of what

5  the contracts say.

6          Okay, let me -- the royalties issues, I think, are

7  all set out there.  Lost profits is also barred.  Unjust

8  enrichment, Your Honor, their claim fails because everything

9  here is based on the contractual claim.  The law is clear

10 that you cannot pursue an unjust enrichment when your claims

11 are based on contract.  that is clear in their agreement

12 itself.

13         Okay.  On the last two points, Your Honor, I'll do

14 them without the slides, and I'll just state them very

15 briefly.  On the Xoma Ireland issue, this is very

16 straightforward.  Xoma Ireland is named in the relevant

17 contracts.  They are suing in the name of Xoma Royalty Corp.

18 They have not pled any connection between them.  If there

19 is, they should have pled it, or they'd be required to plead

20 it.

21         Second, on the release claim, Your Honor, let me

22 just point out this issue.  Separately from this set of

23 agreements, there was another dealing between the parties.

24 And Xoma entered into a release to Janssen.  And in that

25 release, they said -- and I put this on the screen now,

1  Section 3 of the release -- they're releasing against

2  Janssen all the various expansive causes you can think of,

3  claims which in whole or in part relate to claims,

4  allegations, defenses, and issues which could have been

5  raised -- could have been raised in or related to the

6  subject matter of the dispute.  And here, Your Honor, there

7  is no dispute that this present disagreement was raised in

8  the runup to that agreement.  And it was discussed among the

9  parties.  So it's clearly triggered by the could which have

10 been raised part of this.

11         The only response to this, Your Honor -- this is

12 my last point, then I'll stop -- the only response to this

13 is they say, well, you know, could have been raised has to

14 relate to the end of that sentence you see on the screen

15 there, which is off the dispute.  Even if that were true, it

16 wouldn't matter because this was raised in the context of

17 the dispute.  But more importantly, Your Honor, this --

18 whether you take the rules of statutory construction, like

19 the rule of the last antecedent, dispute is relating to that

20 loss subpart.  The middle subpart could have been raised

21 in --

22         THE COURT:  They say there's something in writing

23 excluding the Centocor agreement from the release.

24         MR. MANGI:  Yeah, they do.  And they're talking

25 about discussions between the parties.  Right?  But here's

1   the key point, Your Honor --

2           THE COURT:  But in writing.  Isn't there something

3   in writing?

4           MR. MANGI:  Yeah, yeah, they had emails.  They had

5   back and forth.  They attach one.

6           But here is the point that we want to urge to you

7   on this point, Your Honor.  You know, Xoma is the definition

8   of a sophisticated party.  It exists only to sue, right?

9   Xoma did this BCE work in the early 2000s.  But in more

10  recent years, it's just a litigant.  It just exists to bring

11  lawsuits.

12          Now, if a sophisticated party like that chooses to

13  enter into a broadly phrased release that is triggered --

14          THE COURT:  You had other agreements with Xoma,

15  directly.  Janssen.

16          MR. MANGI:  Sure.  And they released them.  And

17  they released this one, too.  Because if it had been raised,

18  it's released.  And they agree it was raised.  And whatever

19  the discussions were, the bottom line, Your Honor, is when

20  you're an entity like Xoma that exists to litigate, live by

21  the sword, you die by the sword.  If you enter into a

22  release that is broader than you intended, that's your own

23  problem.

24          THE COURT:  I'll take a close look at it.  I'm

25  looking at the tolling agreement now and it's between

```
1   Janssen and Xoma Corporation.  But you do acknowledge in
2   here that Xoma, through its predecessor in interest Xoma
3   Ireland Limited, and when I look at what I think is Exhibit
4   3, which is the Xoma Ireland Limited liquidation, I see Xoma
5   Corp. acquiring the Irish contracts, et cetera.
6              MR. MANGI:  Yeah.  On that --
7              THE COURT:  It seems to me they are a successor in
8   interest.
9              MR. MANGI:  On that -- our point on that one, Your
10  Honor, yes, it's there in one of these recitals clauses.
11  And they provided sort of a daisy chain of contractual
12  disclosures.  Maybe they're right about that.  But they have
13  to plead it.
14             THE COURT:  This all goes to standing, obviously.
15             MR. MANGI:  Yeah, standing.  Not on the release
16  but on the prior issue, whether Xoma Ireland to should be
17  here.
18             THE COURT:  Release is separate.  And I'll take a
19  close look at that.
20             MR. MANGI:  Yeah, okay.  Thank you, Your Honor.
21             THE COURT:  Thank you.
22             All right, counsel.
23             MR. MARANDETT:  Thank you, Your Honor.  If we can
24  just switch our computer, which will just take a second.
25  Then I will certainly get you out of here before 12:45.
```

1          THE COURT:  Sure.

2          MR. MARANDETT:  If I may approach, I have hard

3     copies of our slides as well.

4          THE COURT:  Yes.

5          MR. MARANDETT:  Thank you, Your Honor.  And I

6     think we now have successfully switched the slides.

7          I want to start by providing some context that I

8     think goes back to the point that you made at the beginning

9     of the argument.  Because I think the overall commercial

10    context in which these agreements were entered into is

11    important, and it's part of the analysis that should be

12    followed in determining what the contract means and

13    resolving, to the extent there are disputed questions.  And

14    all of this is set forth in the complaint.

15         Xoma developed this proprietary BCE technology

16    that you made reference to.  That technology is a research

17    tool that is critical to make antibody libraries like the

18    MorphoSys library work.  And what these antibody libraries

19    are is they're really cell lines that express proteins.

20    Antibodies are antibody fragments.  And allow those antibody

21    candidates to be then tested and optimized.  And that allows

22    you to search through millions of possible antibody

23    candidates and settle on those that might be commercially

24    relevant.

25         THE COURT:  I read this with great interest,

1    because I had a patent case involving identifying DNA

2    strands.

3              MR. MARANDETT:  Yes.

4              THE COURT:  And how many DNA strands are in a

5    cell, and how do you find the same DNA cell that you've done

6    research on or DNA strand that you've done research on three

7    days later when you go back.

8              MR. MARANDETT:  Right.

9              THE COURT:  And they developed the technology to

10   cut through a lot of layers in order to find that DNA

11   strand.  It was fascinating.

12             MR. MARANDETT:  Yeah.  And in some ways what we're

13   talking about here are antibodies, as distinct from DNA

14   strands --

15             THE COURT:  It looked to me pretty like --

16             MR. MARANDETT:  The idea is similar.  And in the

17   drug discovery process, when you're thinking about

18   therapeutic antibodies, it's really hard to find antibodies

19   that have the right properties.  And these libraries and the

20   tools used to evaluate the libraries, which is what Xoma

21   invented, are critical to making the libraries work.

22             So what Xoma did is it licensed the technology to

23   MorphoSys in the first instance for actually quite small

24   economics.  And it got some shares in MorphoSys stock that

25   were worth a small amount of money, but that's all.  And the

1    reason they set it up that way is because the whole program
2    was designed to have economics on the back end if an
3    antibody discovered using this proprietary technology
4    ultimately became successful.  That's what led us to the
5    point we're at here.
6             When MorphoSys then licensed its library, enabled
7    using the Xoma technology, to Janssen, it did so -- it was
8    required to provide a copy of the underlying license that
9    we've been talking about and the very specific restrictions
10   that limit the use of the results of the use of the Xoma
11   technology to only research and development, until you get
12   to the commercial stage.  And then they need to come back
13   and get a commercial license.  That was the entire structure
14   and business model, which was well understood by the
15   parties, and clear from the structure of the agreement.
16            And I would say that the back and forth that we
17   just had about the difficulty in interpreting these
18   contracts and this language, I think frankly ends the
19   inquiry at this motion to dismiss stage.  Because at best
20   for them, what we've got is some ambiguity.  I think
21   actually that if you read the contract, it's fairly clear
22   that the commercialization restrictions in fact do limit
23   what Janssen can do.
24            And we talked about the use of Xoma's patents.
25   Xoma's patented technology was used in the discovery phase.

1    There's no dispute about that, at least that I've heard so

2    far.  It was necessary to develop the antibodies that

3    ultimately became Tremfya.  So that was the use of Xoma's

4    patented technology.

5           Those antibodies and information about the

6    antibodies, which are within the definition of transferred

7    materials, were then transferred to Janssen.  And Janssen

8    did further development, as was explained, and then

9    ultimately had a commercial product.

10          Now, separately, there would be a requirement if

11   they were to manufacture their product commercially using

12   Xoma's patented methods, they'd need a separate license for

13   the commercial manufacturing.  Those are two distinct

14   rights.  And we'll come back to the language in the notice

15   that you spent so much time talking about in the front of

16   the argument.

17          THE COURT:  Let me ask you a question.  Both sides

18   have taken the position that the language is clear, and you

19   want me to find that the language in the contract is clear.

20   That almost on the surface says there's an ambiguity.  But

21   I'll take a close look at it.

22          But on a breach of contract claim, you're entitled

23   to a jury trial.  I don't know if it's been requested here.

24   But you're entitled to a jury trial.  Let's assume I find

25   that the contract says clearly A not B.  Where does that

```
 1   leave us in this litigation?  I'm just curious.
 2              MR. MARANDETT:  Well, first --
 3              THE COURT:  I know we're only at the motion to
 4   dismiss stage, but --
 5              MR. MARANDETT:  Yeah, there -- if you -- if you
 6   determine --
 7              THE COURT:  I've read clearly your position in
 8   your brief.
 9              MR. MARANDETT:  Yeah.  If for example you were to
10   determine that we're right and that they were required to
11   get a commercial license from us, and that's decided as a
12   matter of law in our favor, I think there would still be a
13   dispute about what the commercial license looks like.  And
14   we'd have to have a trial on what's an appropriate
15   commercial license in these circumstances.
16              Now, we heard a speculation about how that would
17   mean we could demand a 99 percent royalty.  I can assure you
18   that we will not be demanding a 99 percent royalty.  But
19   there would then be a dispute about what an appropriate
20   commercial license looks like.  And that's something that
21   we'd bring in testimony that there's this course of dealings
22   between the parties.  There's extensive licenses that Xoma
23   has already entered into that are similar in scope to this
24   license.  So you'd have a decision about that.
25              THE COURT:  That kind of testimony is pretty
```

1  standard in patent cases, determining the amount of the

2  royalty, comparing it to other situations.

3         MR. MARANDETT:  Yes.  And in this context in

4  particular, there's a well-established paradigm because, as

5  we said from the context here, this was Xoma's business

6  model.  They licensed this technology to parties that

7  benefitted from the use of these libraries, and they got

8  economics on the back end in the form a reasonable royalty.

9  So that is what would ultimately be litigated, assuming you

10  decided the case in our favor.

11         THE COURT:  Okay.

12         MR. MARANDETT:  Now, on the question, though, of

13  contract interpretation, you're right.  I mean, what the law

14  says if there's two reasonable interpretations of

15  provisions, then it's ambiguous and you need to get into

16  extrinsic evidence that can be used to decide it.  So that

17  alone, is enough to defeat the motion to dismiss.

18         THE COURT:  Yeah.  Does a judge do that, or a

19  jury?

20         MR. MARANDETT:  Well, that's a good question.

21  Because some of the cases will say that even if the judge

22  determines that the contract is unambiguous, particularly in

23  a complex situation like this where context matters, that

24  extrinsic evidence still is relevant to evaluating what the

25  parties' rights are under the agreement.  So even if you

1    were to conclude that the contract is not ambiguous, we get

2    to discovery and we move forward in the case.

3            What they're trying to do is to say the language

4    of the agreement is so clear that it gets decided in their

5    favor at this stage without any evidence whatsoever of the

6    negotiations, of the commercial context, et cetera.

7            THE COURT:  Understood.  Go ahead.

8            MR. MARANDETT:  Now, I want to briefly address the

9    last two points, and then I am going to come back to some of

10   the contract points.  Because I want to emphasize a couple

11   of points that come out of that notice that you spent a fair

12   amount of time talking about with Mr. Mangi.

13           On the standing issue, I think we can dispose of

14   that quite quickly.  The complaint says that Xoma Royalty

15   Corp., which is the party in the -- the Plaintiff in the

16   litigation is the successor in interest to Xoma Corp.  Xoma

17   Corp. is the successor in interest to Xoma Ireland, Inc.

18   And you see that acknowledged in the tolling agreement that

19   we entered into with Janssen.  That couldn't be clearer.

20   There really isn't a fair dispute about that, because

21   they've acknowledged it as much in the tolling agreement.

22   The tolling agreement is referenced in the complaint.  So

23   you can take notice of that agreement.  That alone, I think,

24   ends the inquiry on the standing issue.

25           On the release issue, first a release is an

1  affirmative defense.  It's not an -- and the release that
2  they have cited is not in the record under the complaint.
3  So it's not even appropriate to be decided now.  But if you
4  look at the language of the release, the argument falls
5  apart.
6          What is released, and I'm just moving to the slide
7  that has the language, the parties now -- this is from the
8  settlement agreement.  This is a settlement agreement
9  between -- between Xoma on the one hand and Janssen on the
10  other.
11          The parties desire to fully and forever resolve
12  and settle any and all actual and potential disputes and
13  claims that either party has or may have against the other
14  arising under or relating to the previous agreement or the
15  initial agreement, defined as the dispute.  The previous
16  agreement is a previous agreement between Xoma and Janssen.
17  It is not anything related to the MorphoSys agreements, as
18  was the initial agreement.
19          And then when you get to the release language, and
20  this is the language that you were shown a few minutes ago,
21  claims which in whole or in part relate to claims,
22  allegations, defenses, and issues which have been raised,
23  could have been raised, or relate to the subject matter of
24  the dispute.  The dispute is, again, something entirely
25  separate from the dispute we're here today over related to

```
 1    the MorphoSys agreement.  And in separate correspondence,
 2    the parties acknowledge that.  So again, A, not properly at
 3    -- not properly considered at the motion to dismiss stage.
 4    But, B, completely without merit by simply looking at the
 5    language of the release itself.
 6              THE COURT:  Under Rule 8(c) of the Federal Rules
 7    of Civil Procedure, Affirmative Defenses, in general, and
 8    there's a laundry list, and release is listed.  It's an
 9    affirmative defense.
10              MR. MARANDETT:  However, the release itself is not
11    in the complaint.  It's not referenced in the complaint.
12    It's not part of a contract that's referenced in the
13    complaint.  And in any event, as I said, even if you
14    consider the release, it plainly just doesn't apply to this
15    dispute.  So I think that alone disposes of the argument.
16              THE COURT:  Okay.
17              MR. MARANDETT:  Now, turning to the contract
18    argument, and actually I want to come back to the language
19    that we were talking about a few minutes ago, because
20    Mr. Mangi puts great emphasis on the -- the notice.  And I
21    thought it was interesting that he highlighted and
22    repeatedly discussed a portion of the notice but not the
23    entirety of the notice.  And I think that's what's most
24    important.
25              If you look at that notice language itself, there
```

1   again were several bullets.  And the second and third

2   bullets are the bullets that talk about the limitation on

3   manufacturing using Xoma's patented rights.  So if Janssen

4   were to make its antibody commercially using methods

5   patented by Xoma, they'd need a license, for sure.  That's

6   one set of rights.

7        Secondly though, they specifically promised that

8   as the recipient of any transferred materials, they would

9   agree to abide by --

10        THE COURT:  Where are you reading?

11        MR. MARANDETT:  I'm looking at the fourth bullet

12   of the notice.

13        THE COURT:  Okay.

14        MR. MARANDETT:  If you and MorphoSys enter into a

15   written agreement, that agreement must contain certain

16   provisions specified in the license with Xoma including

17   terms pursuant to which you, as the recipient of any

18   transferred materials -- now, what Janssen received from

19   Xoma was the antibodies and very specific information about

20   the antibodies that ultimately was incorporated into their

21   commercial product.  That is part of what was defined as

22   transferred materials when you go to Section 2.4 of the

23   agreement.

24        You agree to abide by each of the limitations,

25   restrictions, and other obligations provided by the license

1    with Xoma, including without limitation the restrictions on
2    use of such transferred materials for purposes other than
3    research and development.
4            When they commercialized the antibody that
5    incorporated the complementary determining regents, the
6    binding regents, the active portion of the antibody that was
7    discovered using Xoma's patented technology, that violated
8    this provision.  Full stop.  And that's what we think is
9    clear.
10           Now, counsel attempts to contort that language to
11   come up with an interpretation that excludes it.  But again,
12   I think at best at this stage, that renders the question
13   ambiguous and means we move on to discovery.
14           THE COURT:  Right.  They recognize this, what
15   you're saying.  But they're also saying that, in Section
16   2.4, when it uses the word dispose, it would not uncover a
17   license agreement -- well, we have a license agreement with
18   MorphoSys.
19           MR. MARANDETT:  They have a license with MorphoSys
20   from --
21           THE COURT:  You know, that alone may raise some
22   ambiguity.  But how do you -- how do you read it?
23           MR. MARANDETT:  I think they have a license
24   agreement from MorphoSys.  And because they got technology
25   from MorphoSys as well.  With respect to Xoma, that -- if

1  you look back at Section 2.4 of the agreement, it says --

2  and you read the way the transfer restrictions are

3  described, MorphoSys shall not dispose of licensed antibody

4  phage display materials, licensed immunoglobulin

5  information, or the product of the practice of any method

6  within the scope of Xoma's patents, transferred material.

7          So what happened was MorphoSys transferred that

8  information to Janssen.  Under a license to MorphoSys's

9  technology, but with respect to Xoma, they got a limited

10  covenant not to sue that applied only to research and

11  development.  So they didn't get a license to commercial

12  use.  They got only a limited covenant not to sue that gave

13  them the right to do research and development work, but not

14  commercialization.

15          And when you look at the definition of research

16  and development, it plainly excludes commercial activities.

17          Again, I think at best, at this stage of the

18  proceedings, what we're talking about are two competing

19  interpretations, and that means we move forward with

20  discovery and the motion to dismiss denied.

21          THE COURT:  What does it mean, the product or the

22  practice of any method within the scope of the Xoma patents?

23          MR. MARANDETT:  So the result of -- you know, the

24  antibody was discovered using the Xoma technology in the

25  MorphoSys library.  So the -- and you'll note that part of

1    that definition also includes immunoglobulin information.

2    It's what was derived from the library using the Xoma

3    technology.  And that ultimately was incorporated into what

4    became the commercial product Tremfya.  And that's what's

5    prohibited, that it be used -- without a commercial license

6    from Xoma, it be used for non-research and development

7    purposes.

8              THE COURT:  Go ahead.

9              MR. MARANDETT:  Now I want to just briefly -- I

10   want to briefly address the limitation of liability

11   provision as well.  And I'm going to skip over some of the

12   other things in our slides, because I think you've got the

13   briefing as well.  But I just want to briefly address the

14   limitation of liability provision as the final point.

15             The Centocor agreement has a limitation of

16   liability provision in it that doesn't identify Xoma as a

17   third party beneficiary.  Xoma is identified as a third

18   party beneficiary for certain purposes, not all purposes.

19   It wasn't a party to that limitation of liability clause.

20   It didn't see it even until we got into this litigation.

21   It's just simply not appropriate for it to be bound by it.

22             The reference to the arbitration clause is a

23   little bit of a red herring.  Arbitration often gets

24   enforced very broadly as a dispute resolution process.  We

25   initiated this as an arbitration because that's what the

1     agreement called for.  When Janssen's counsel told us they

2     didn't want to agree to arbitration, we said fine, and we

3     filed a litigation.  That wasn't a concession that we're

4     therefore bound by a limitation of liability --

5              THE COURT:  Both sides agreed to it.

6              MR. MARANDETT:  Yeah.

7              Next, even if the limitation of liability clause

8     did apply, and I think it doesn't, the damages that we're

9     seeking here are not covered by the limitation of liability.

10    Because we're not seeking lost profits, we're not seeking

11    consequential damages.  What we're seeking is the specific

12    benefit of the bargain that we got.

13             The express agreement that Janssen entered into

14    when it made Xoma third party beneficiary was that it would

15    not use transferred materials for commercial purposes

16    without a commercial license.  They then went ahead and

17    commercialized, thereby breaching that agreement.  So what

18    we're entitled to is a commercial license, direct damages

19    that flow directly from the rights that we bargained for.

20    So it wouldn't even apply.

21             And in any event, the type of damages and the

22    analysis of whether damages fall within one of the

23    categories that might be covered is a question that should

24    be decided by the fact finder, ultimately.  It is not

25    something that can be determined at the motion to dismiss

1  stage.  So I think, for that reason as well, we get past

2  this motion to dismiss.  And if that issue is to be raised,

3  it should be raised at a later point.

4          THE COURT:  I understand.

5          MR. MARANDETT:  So with that, Your Honor, I think

6  we get you out 20 minutes early.

7          THE COURT:  All right, and I understand the unjust

8  enrichment point raised by both sides.  That's well briefed.

9          We have some rebuttal?

10          MR. MANGI:  Your Honor, I will just make a few

11  quick points here.

12          First, Your Honor asked a procedural question.

13  Let me give you our perspective on that as well.

14          We are here on a motion to dismiss.  If Your Honor

15  agrees in whole or in part with Janssen's arguments, then

16  the answer is the case is dismissed, either in whole or in

17  part, depending on what Your Honor agrees with or disagrees

18  with.

19          If Your Honor does not agree with our reading, I

20  submit the answer then is you would deny our motion to

21  dismiss and then we'd come back to you on -- perhaps on

22  summary judgment.  Otherwise the case would go to a jury.

23  That's the procedural posture in which we are.

24          Let me go to the merits.  First, Your Honor, their

25  point here is tied up in this, you know, what's the business

1   model and what would Xoma ideally desire.  I have no doubt

2   Xoma would ideally desire to have as much money as possible

3   from as many places as possible.  That doesn't matter.  The

4   question is, what do the contracts provide.  And they did

5   enter into a contract with MorphoSys.  That's where all of

6   this comes from, ultimately.  And their remedy, if they have

7   one, is against MorphoSys.  Just like it was in Aries

8   Trading.  And they agree with that.  We know that, because

9   they spent the last four years suing MorphoSys.  And they

10  didn't succeed in that.  In fact, they had to pay

11  MorphoSys's attorneys' fees.

12          But the point is, under the structure of the

13  arrangements here, that's the party that they can seek to

14  redeem their supposed business model against, not us.

15          Next point, Your Honor.  Let me go to the

16  contracts, because I think there's -- there's one important

17  point here, Your Honor, that I want to emphasize.  You take

18  all these agreements, you know, you put them in the ether.

19  But what is it that you ultimately end up with?

20          If you consider MorphoSys's perspective on all of

21  this, what you end up with is the most remarkable of

22  positions.  Why?  Because when the contract says at Schedule

23  2.4 that Janssen as a MorphoSys collaborator, will be

24  permitted to commercialize -- will be permitted to

25  commercialize -- they want you to read that as, you will not

1  be permitted to commercialize unless you get a commercial

2  license from us.  That is the exact opposite of what the

3  contract says.  And, by the way, that bullet point is not

4  talking about production.

5        The next bullet point, which has a restriction on

6  the statement here does.  But this one is unrestricted.

7  It's just saying in an unrestricted way, you will be

8  permitted to commercialize.

9        And, you know, for the Court to then construe that

10  as you will not be permitted to commercialize, I would

11  submit, is not reconcilable with the agreements.

12        And then, of course, we have Section 2.3.b.

13  Again, part of the agreement specifically saying MorphoSys

14  collaborator, Janssen, shall be permitted to make or have

15  made any product by any means of its selection other than

16  those that infringe a claim of their patent.  They want you

17  to read that to say you will not be permitted to make

18  through other means of your choice that don't infringe on

19  the patent.

20        They are asking you to adopt an interpretation

21  that is the exact opposite of these phrases that are clear

22  and categorical.  And when it comes to other parts of the

23  agreement, transferred materials certainly takes care of

24  those.  But even if it didn't, when you read all of these

25  things together, the meaning can only be one.  And it is the

1    meaning that I have just pointed to you through these

2    statements.  There is no ambiguity in those statements.  And

3    that's their statement from the time, telling us what this

4    contract meant.

5              So between Schedule 2.4 and Section 2.3.b, I would

6    submit, Your Honor, that ends it.

7              Let me make one other point, which is this issue

8    on the limitation of liability.  Your Honor, we pointed out

9    in our brief there is case law saying that if you sue as a

10   third party beneficiary of a part of a contract and it has a

11   limitation of liability provision, you're bound by that,

12   because you can't take any more rights than the original

13   contracting parties.  You will notice that throughout their

14   opposition briefing, which is 30 pages and hits on every

15   point, they never touched on any response to that case law.

16   They didn't touch on it today, either.  Because the law is

17   clear and unambiguous, they're bound by it.

18             Once they are bound by it, then the question is

19   what my friend just raised.  He said, well, we're suing for

20   the express agreement.  We're suing for the benefit of the

21   bargain.  But when you look at that contract, Your Honor,

22   the Janssen MorphoSys agreement that they're suing as a

23   third party, it says two things in it.  Number one, it says

24   we, Janssen, owe royalties to MorphoSys.  And there's an

25   elaborate structure for this.  That's the direct benefit of

1   the bargain.  If MorphoSys sued us saying, where are those

2   royalties I was promised, that would be direct damages.

3        Second, that agreement also says, it doesn't say

4   we will ever owe them royalties.  It doesn't even

5   contemplate that.  It says the opposite.  It says, any

6   royalties that are owed to Xoma are owed by MorphoSys, not

7   by Janssen.  So that, Your Honor, by definition, makes it

8   impossible for their royalties claim against us to be direct

9   damages.  What it is, is a hypothetical claim saying, well,

10  in that situation, we think there should have been a further

11  royalty deal.  But that's not in the agreement.  It is not a

12  royalties contract from us to them.

13       And if that is true, then by definition, under the

14  case law that is in our brief, and Your Honor will see it in

15  the slides I didn't go through in detail today, but it is

16  pulled out there as well, this is by definition indirect or

17  consequential damages claim.  It is by definition a lost

18  profits claim.

19       So no matter which way you read that, they don't

20  have a claim monetarily.

21       THE COURT:  One of their arguments is they're not

22  seeking the kind of damages listed in that limitation of

23  liability clause.  I have to even decide whether or not

24  that's ambiguous, that provision.  And I'll take a look at

25  your cases, certainly.  Because it may not be.

1              On the other hand, can you just address the issue

2    I raised about the -- on a breach of contract, you're

3    entitled to a jury trial.  If I say that A is correct and

4    there interpretation, where does that take us?

5              MR. MANGI:  Well, I think, Your Honor, if Your

6    Honor agrees with something that they have said --

7              THE COURT:  Or you.  Either side.

8              MR. MANGI:  Well, look, if you agree with us on

9    any point, then you grant that motion to dismiss in whole or

10   in part.  If you disagree with us and you agree with them,

11   all we're here on today is a motion to dismiss.  Right?  So

12   then you would deny that motion to dismiss.  The case goes

13   forward.  And maybe at some point, someone comes back to you

14   and says, okay, now we want summary judgment.  And then Your

15   Honor will decide whether it's appropriate for summary

16   judgment or there are issues here that should go to a jury.

17             But coming out of today, either Your Honor agrees

18   to dismiss in whole or in part, or Your Honor doesn't.  I

19   don't think you should go anywhere else.

20             THE COURT:  If I decide the contract means X, is

21   the jury bound by that?

22             MR. MANGI:  If Your Honor decides the contract --

23             THE COURT:  Yeah.

24             MR. MANGI:  Well, I think the question would be,

25   Your Honor, are you deciding --

1          THE COURT:  It might be a simple answer to
2    research.  But I'm just -- the way it's been posed to me in
3    these briefs, I'm just curious what your position is.
4          MR. MANGI:  I think, Your Honor, what you're
5    really talking about is, in a summary judgment posture, if
6    you were to take certain issues away from the jury and
7    require them to have them found as a matter of law, what
8    would be the implications there.  I don't think that's an
9    issue that is presented on a motion to dismiss.
10          And the reason for that is if Your Honor chooses
11    not to agree with us for any reason and not to dismiss the
12    case, then any subsequent judgments may be informed by what
13    happens in discovery.
14          THE COURT:  All right, okay.
15          MR. MANGI:  Thank you, Your Honor.
16          THE COURT:  All right.  Anything further?
17          MR. MARANDETT:  One -- just one -- two points,
18    actually.  One --
19          THE COURT:  I need you to speak into a microphone.
20          MR. MARANDETT:  Oh, sorry.  I'll move up.
21          THE COURT:  That's all right.
22          MR. MARANDETT:  First, the Aries Trading case, I
23    think actually is a worthwhile read because it lays out the
24    context quite well.  The distinction that was mentioned to
25    that actually relates to some particular language in that

1  contract that's fundamentally different than the language

2  here.

3          In this case, Xoma was made an express third party

4  beneficiary, and restrictions related to Xoma were imposed

5  on Janssen.  That's a little bit different than what

6  happened in that case.

7          But in terms of the idea of and the legal concept

8  of a royalty being paid for commercial sale based on a

9  product discovered earlier using patented technology, I

10  think that case is quite helpful.

11         The only other point I wanted to make is we'd like

12  to get this case moving, and I just have a question of

13  whether we can set a Rule 16 conference so that we can move

14  forward.

15         THE COURT:  Yeah, I know, I was going to get to

16  the motion to stay discovery.  And my practice is to have no

17  discovery until I decide the motion to dismiss.  And then

18  I'll bring you in for a Rule 16 conference and enter a

19  scheduling order and we'll set all that.

20         I wouldn't vary in this case, because the parties

21  aren't going anywhere.  They will be there.

22         MR. MARANDETT:  Correct.

23         THE COURT:  I mean, whether it's now or two months

24  from now when I issue an opinion on the motion to dismiss.

25  So I don't see any prejudice.

1          Sometimes, there might be a situation that

2     requires it.  But these documents are not going away, and

3     all the discovery will be around two months from now when I

4     get my opinion out as they are today.  So I'm sure counsel

5     agrees with that.  And I know you've opposed it, counsel.

6     And I'm going to deny the motion to stay discovery -- I mean

7     grant the motion to stay.

8          MR. MARANDETT:  To stay.

9          THE COURT:  To stay.  All right.  It'll give you

10     some breathing room.

11          MR. MARANDETT:  Thank you, Your Honor.

12          THE COURT:  All right.  Now I think this has been

13     well briefed and the arguments have been well presented.

14     And I don't feel I need any supplemental briefing.  The

15     issues are quite clear to me.

16          All right.  Anything further anyone wants to put

17     on the record?

18          MR. MANGI:  Not for Janssen, Your Honor.  Thank

19     you.

20          MR. MARANDETT:  No, thank you.  Your Honor.

21          THE COURT:  We'll stand in recess.

22          MR. MARANDETT:  Thank you.

23          MR. MANGI:  Thank you.

24          (Whereupon, the hearing was adjourned at

25     12:31 p.m.)

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2

3   I, Christopher B. Cutchall, certify that the foregoing is a

4   true and accurate transcript from the official electronic

5   sound recording of the proceedings in the above-entitled

6   matter.

7

8   _____        November 17, 2025

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25