IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| XOMA ROYALTY CORPORATION<br>(f/k/a Xoma Corporation),<br>                     Plaintiff,<br>   v.<br>JANSSEN BIOTECH, INC.<br>(f/k/a Centocor, Inc.),<br>                 Defendant. | CIVIL ACTION<br>NO. 25-4484 |

## OPINION

**Slomsky, J.**                                                   **December 30, 2025**

### TABLE OF CONTENTS

I.      **INTRODUCTION**.................................................................................................... 1

II.     **BACKGROUND** .................................................................................................... 1

   A.  Factual Background ......................................................................................... 1

      1.   Xoma and MorphoSys—the early days ...................................................... 1

      2.   MorphoSys grows its business..................................................................... 4

      3.   MorphoSys partners with Janssen................................................................ 5

      4.   Discovery of Guselkumab using BCE Technology ...................................... 7

      5.   Guseklkumab is approved as Tremfya® ..................................................... 8

   B.  Procedural Background.................................................................................... 8

III.    **STANDARD OF REVIEW**.................................................................................. 9

   A.  The appropriate standard of review is under Federal Rule of Civil Procedure 12(b)(6) ...... 9

IV.    **ANALYSIS**.......................................................................................................... 12

   A.  Defendant's Motion to Dismiss the Breach of Contract Claim Will Be Denied. ............. 12

1.    The Meaning of "Disposition" and "Transferred Materials" is ambiguous.................. 14

2.    The Centocor Agreement is ambiguous on whether ....................................... 17
      it permits commercialization........................................................ 17

3.    The Limitation of Liability Clause is ambiguous. ......................................... 22

4.    Plaintiff has plausibly alleged a Breach of Contract Claim ........................................ 25

B.    Plaintiff has plausibly alleged, in the alternative, an Unjust Enrichment Claim. ............. 26

C.    Plaintiff has Standing to assert Claims against Defendant. ............................................. 27

**V.    CONCLUSION** ...................................................................................... 28

## I.    INTRODUCTION

At its core, this case is a story about two different interpretations of a contract.  And, like many good stories, this one is rife with compelling characters and a long history that goes back more than two decades.  Plaintiff Xoma Royalty Corporation ("Plaintiff") is an antibody research and development company.  Defendant Janssen Biotech, Inc. ("Defendant") is a biopharmaceutical company that develops and markets pharmaceuticals.  At issue here is whether Defendant is in breach of a contract and owes royalties to Plaintiff in connection with the development of, and sales generated by, the pharmaceutical, Tremfya®.  Before the Court is Defendant's Motion to Dismiss the Complaint filed against it for (1) Lack of Standing, (2) Lack of Subject Matter Jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and (3) Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6).  For reasons discussed below, Defendant's Motion to Dismiss the Complaint will be denied.

## II.    BACKGROUND

### A.  Factual Background

The following factual recitation is taken from Plaintiff's Complaint, as well-pleaded allegations within the Complaint are taken as true at the Motion to Dismiss stage of litigation. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).

### 1.  Xoma and MorphoSys—the early days

Plaintiff Xoma is one of the oldest antibody research and development companies in the world.  (Doc. No. 1, ¶ 11.)  After its founding in 1981, Plaintiff's business focused primarily on the identification and development of novel therapeutic antibodies[1] and antibody fragments. (Id.)

---

[1]    Antibodies are proteins, produced by the immune system, that attach to antigens (foreign

Plaintiff developed and now owns the patent rights to what is known as Bacterial Cell Expression Technology ("BCE Technology").  (Doc. No. 1, ¶ 13.)  BCE Technology allows scientists to produce antibodies and antibody fragments within certain kinds of bacterial cells.  (Id.)  In essence, BCE Technology uses certain viral vectors[2] to introduce DNA required to produce antibodies in bacterial cells.  (Id.)  BCE Technology is vital to the operation of an antibody discovery system known as a phage display library.[3]

Since the mid-1990's, Plaintiff established a program by which it licensed its BCE Technology to third parties as a discovery and production platform for proteins, particularly antibodies and antibody fragments.  (Doc. No. 1, ¶ 14.)  As part of this licensing program, in the early 2000's, Plaintiff initiated discussions with another company, MorphoSys,[4] about a possible license permitting MorphoSys to use Plaintiff's BCE Technology patents.  (Doc. No. 1, ¶ 15.)

---

substances) and remove them from the body.  *Antibodies*, CLEVELAND CLINIC (May 6, 2022) https://my.clevelandclinic.org/health/body/22971-antibodies.  Another word for antibody is immunoglobulin.  Id.

[2]    Viral vectors are tools used to deliver genetic material to cells.  *Viral Vector*, BRITANNICA (Nov. 17, 2025) https://www.britannica.com/science/viral-vector.  The most common applications of viral vectors are in research and development of vaccines and gene therapy.  Id.  Often, cells targeted by viral vectors are manipulated to express genes that could have therapeutic effects.  Id.

[3]    Phage display technology allows for human antibody proteins to be engineered and expressed on the surface of bacteriophage virion particles.  *Monoclonal Antibody*, BRITANNICA (Dec. 2, 2025), https://www.britannica.com/science/monoclonal-antibody#ref1278452.  One asset Plaintiff licenses to third parties is use of its phage display library.  XOMA, https://xoma.com/opportunities/assets-available-for-license/ (last visited Dec. 5, 2025).

[4]    MorphoSys was a German-based global biopharmaceutical company that was acquired by Novartis in 2024.  See *Novartis to strengthen oncology pipeline with agreement to acquire MorphoSys AG for EUR 68 per share or an aggregate of EUR 2.7bn in cash*, NOVARTIS (Feb. 5, 2024) https://www.novartis.com/news/media-releases/novartis-strengthen-oncology-pipeline-agreement-acquire-morphosys-ag-eur-68-share-or-aggregate-eur-27bn-cash.

At that time, MorphoSys focused on discovering antibodies for development as biopharmaceutical products. (Id.) MorphoSys sought the license from Plaintiff to compete with other phage display companies and attract third parties with whom MorphoSys could collaborate to ultimately discover new antibodies. (Id.) Before seeking the license from Plaintiff, MorphoSys was mostly a service-based company, meaning it offered access to its own antibody libraries and/or provided antibody discovery services to larger companies. (Id.)

MorphoSys's core patented technology is what is called a Human Combinatorial Antibody Library ("HuCAL"). (Id. at 17.) HuCAL is a compilation of antibodies that have been produced synthetically to mimic human antibodies. (Id.) Plaintiff's BCE Technology is essential to the HuCAL process for the development of antibodies. (Id. at ¶ 21.)

HuCAL antibody libraries are created by using viruses to infect bacteria (something called bacteriophage or "phage") so that the binding elements of an antibody can be introduced into bacterial cells. (Id. at ¶ 18.) Critically, Plaintiff's BCE Technology is essential to the use of bacteriophage: through introducing antibodies of interest into bacterial cells and enabling those cells to produce, or "express," antibodies which can then be tested for binding to specific antigens. (Id.) HuCAL antibody libraries are comprised of antibody fragments (known as "Fabs") that can be screened to find a specific antibody fragment with specific features—like binding to particular antigens. (Id. at ¶ 19.) The antibody fragment is then expressed and secreted into a bacterial cell allowing for further study. (Id.) Plaintiff avers here that because MorphoSys (and Defendant) elected to work with bacteria and phage display, Plaintiff's BCE Technology was necessary to get the antibody fragments onto the surface of the phage—an essential step in the antibody selection process. (Id. at 21.)

### 2. **MorphoSys grows its business**

In the early 2000's Plaintiff and MorphoSys entered into the Xoma Master Licensing Agreement ("Master Licensing Agreement") which contained: 1) a License Agreement effective February 1, 2002; 2) an Amendment and Termination Agreement effective February 13, 2003; and 3) a License Agreement effective February 13, 2003. (Id. at ¶ 23.) In accordance with the terms of the Master Licensing Agreement, Plaintiff licensed MorphoSys to use its patented technology as a research tool to discover antibodies for future use as a potential therapeutic drug. (Id.) More specifically, Plaintiff agreed to provide a license to MorphoSys under certain conditions—namely, that in exchange for the license to use Plaintiff's technology, if a product that used Plaintiff's technology ever reached the market, Plaintiff would receive royalty payments from either, or both, MorphoSys (if it was the selling party) and its collaborators (if they were the selling parties). (Id.)

Plaintiff avers that absent the Master Licensing Agreement, MorphoSys would not have been able to attract new customers and grow its business. (Id. at ¶ 24.) According to the Complaint, each step in MorphoSys's antibody discovery process—from the creation of antibody fragment libraries, use of those libraries, as well as the isolation and processing of candidates from those same libraries—would not have been possible without Plaintiff's BCE Technology. (Id.) Because BCE Technology enables antibody phage display, it is essential to identify antibodies. (Id.)

In exchange for a license to Plaintiff's patented technology, MorphoSys agreed to several transfer restrictions in the Master Licensing Agreement. (Id. at ¶ 25.) The provisions of those restrictions include, in relevant part, that:

4

Morphosys shall not (i) undertake any Antibody Phage Display Activities on behalf of a Third Party or (ii) Dispose of Licensed Antibody Phage Display Materials, a Licensed Immunoglobulin, Licensed Immunoglobulin Information or the product of the practice of any method within the scope of the XOMA Patents ("Transferred Materials") to any Third Party until (in the case of either clause (i) or clause (ii)) such time as it has provided to such Third Party the redacted copy of this Agreement referred to in Section 4.2 and the form of notice set out at Schedule 2.4.

If MORPHOSYS enters into a written arrangement with any Third Party arising out of or relating to activities to which it or such Third Party does or intends to claim the benefits of any licenses or other grants provided for by this Agreement, such written arrangement shall contain provisions (i) pursuant to which the recipient of any Transferred Materials agrees to abide by each of the limitations, restrictions, and other obligations provided for by this Agreement, including, without limitation, the restrictions on use of Transferred Materials for purposes other than Research and Development; (ii) implementing a covenant not to use Transferred Materials for any purpose other than for Research and Development Purposes otherwise authorized by this Agreement; (iii) providing that the "first sale" doctrine does not apply to any Disposition; and (iv) permitting a MORPHOSYS Collaborator to further Dispose of Transferred Materials only to a Third Party who otherwise meets the definition of a MORPHOSYS Collaborator and who executes a written agreement in which it undertakes all of the obligations applied to the transferring party. XOMA shall be, and the agreements subject to this Section 2.4 shall provide that XOMA shall be, an intended third-party beneficiary with respect to the foregoing provisions.

(Doc. No. 17-2, Ex. B.)

### 3. MorphoSys partners with Janssen

After executing the Master Licensing Agreement, MorphoSys entered into several research collaboration agreements in which MorphoSys licensed to its partners its own proprietary HuCAL technology as well as Plaintiff's BCE Technology. (Id. at ¶ 27.) In 2004, MorphoSys entered into one such agreement with Defendant, referred to as the Centocor

Agreement.[5]  (Id.; Doc. No. 17-1, Ex. A.)  The Centocor Agreement restricts the

commercialization of products using Plaintiff's BCE Technology and includes language taken

directly from the Master Licensing Agreement:

> (a) Subject to the limitations contained therein, MORPHOSYS hereby grants to CENTOCOR and those affiliates agreeing to the requirements set forth in this Section 3.8(a) the benefits of the covenant-not-to-sue ("XOMA Covenant") under a license agreement between MORPHOSYS and XOMA IRELAND LIMITED ("XOMA License Agreement"), with regard to the "Patent Rights" listed in Schedule 1.17 of the XOMA License Agreement, to the extent necessary to permit CENTOCOR and such Affiliates to practice any licenses granted by MORPHOSYS to CENTOCOR hereunder. The benefits of the XOMA Covenant shall be personal to CENTOCOR and its Affiliates (as the case may be) and non-sublicensable or further conveyable, and shall not include the right to commercialize any products under XOMA's patent rights. CENTOCOR and any Affiliate wishing to receive the benefits of the XOMA Covenant hereby acknowledge that each has read the redacted copy of the XOMA License Agreement that is appended hereto as Appendix 1.51, and CENTOCOR and any Affiliate wishing to benefit from the XOMA Covenant agree to abide by the provisions contained therein. In particular, CENTOCOR and such affiliates agree that each shall abide by each of the provisions under Sections 2.4(b)(i) through 2.4(b)(iv) of the XOMA License Agreement, and CENTOCOR, its affiliates and MORPHOSYS hereby agree that XOMA shall be an intended third party beneficiary with respect to such agreement to abide by such provisions. CENTOCOR acknowledges, on its own behalf and on behalf of its affiliates, that the benefits under the XOMA Covenant are limited by the exclusions set forth in Section 2.3 of the XOMA License Agreement. CENTOCOR will notify MORPHOSYS of each affiliate desiring access to the XOMA Covenant.

(Doc. No. 17-1, Ex. A.)

---

[5]  In 2011, Centocor Ortho Biotech Inc. changed its name to Janssen Biotech, Inc. See Kristen Fitch, *Remicade maker Centocor Ortho Biotech changing name*, SCIENCE CENTER (June 22, 2011) https://sciencecenter.org/news/remicade-maker-centocor-ortho-biotech-changing-name.

### 4.  Discovery of Guselkumab using BCE Technology

Upon partnering, MorphoSys and Defendant agreed to the terms of a research program using HuCAL and Plaintiff's BCE Technology to find Fabs to the p19 and p40 subunits of interleukin 23 ("IL-23").  (Doc. No. 1 at ¶ 30.)  IL-23 is a naturally occurring cytokine[6] involved in ordinary inflammatory and immune responses.  (Id.)  This program used HuCAL—as well as Plaintiff's BCE Technology—to discover, isolate, and improve the antibodies incorporated into the pharmaceutical Tremfya®.[7]  (Id.)  In an interview with MorphoSys's Chief Executive Officer and Chief Scientific Officer, they noted that work on the IL-23 target for Centocor in MorphoSys's labs began in 2003 and the resulting antibodies that were discovered were delivered to Centocor in 2005.  (Id.)  During this period, guselkumab, the active ingredient in Tremfya®, was discovered, isolated, and improved.  (Id.)  Notably, Plaintiff maintains these events occurred before the expiration of Plaintiff's antibody secretion patents contained in the BCE Technology.  (Id.)

By December 2005, MorphoSys granted a further license to Defendant for use of IL-23. (Id. at ¶ 31.)  The antibody binding domains were then "affinity matured" (e.g. processed to improve their binding characteristics) by MorphoSys using Plaintiff's BCE Technology and became known as CNTO1959.  (Id.)  Also in December 2005, Defendant filed a provisional patent application covering antibodies discovered by Defendant including the specific antibody

---

6   "Cytokines are proteins that function as chemical messengers in [the human] immune
    system."  *Cytokines*, CLEVELAND CLINIC (Jan. 3, 2023),
    https://my.clevelandclinic.org/health/body/24585-cytokines.

7   Tremfya ® (guselkumab) is a prescription medicine that is used to treat plaque psoriasis,
    psoriatic arthritis, ulcerative colitis, and Crohn's disease.  TREMFYA® (Nov. 2025),
    https://www.tremfya.com/.

7

binding domains that were discovered using Plaintiff's BCE Technology. (Id.) That application formed the basis for Defendant's patent covering Tremfya®. (Id.)

In 2010, as required under the terms of the Centocor Agreement, Defendant reported to MorphoSys that CNTO1959 had passed initial clinical testing and that a phase 2 clinical trial would commence. (Id. at ¶ 35.) These activities, as defined in the Master Licensing agreement, were limited only to research and development. (Id.) Research and development of CNTO1959 continued and that antibody eventually became known as guselkumab. (Id.)

### 5. Guselkumab is approved as Tremfya®

On July 13, 2017, Defendant announced that the United States Food and Drug Administration ("F.D.A") approved Tremfya®. (Id. at ¶ 37.) Tremfya® is an injectable formulation of the antibody guselkumab. (Id.) Guselkumab is a human monoclonal antibody.[8] (Id.) It selectively binds to the p19 subunit of IL-23 and inhibits its interaction with the IL-23 receptor. (Id.) These binding features of guselkumab are what enable its therapeutic effect. (Id.)

Since its commercial launch in 2017, sales of Tremfya® have generated more than $14.5 billion. (Id. at ¶ 40.) According to the Complaint, Defendant paid MorphoSys milestone payments and royalties but never sought or obtained a commercial license from Plaintiff, nor paid Plaintiff any royalties in connection with the sale of Tremfya®. (Id. at ¶41.)

### B. Procedural Background

On August 8, 2025, based upon the above events, Plaintiff filed the Complaint against Defendant. (Doc. No. 1.) On September 10, 2025, in lieu of filing an answer, Defendant filed a Motion to Dismiss the Complaint. (Doc. No. 10.) On October 16, 2025, Plaintiff filed its

---

[8]    Monoclonal antibodies are proteins developed in laboratories that act like proteins—called antibodies—within the human body. See *Monoclonal Antibodies*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/22246-monoclonal-antibodies (last visited Nov. 18, 2025). Monoclonal antibodies help stimulate the immune system. Id.

Opposition to the Motion to Dismiss.  (Doc. No. 34.)  Finally, on November 5, 2025, Defendant

filed a Reply in Support of the Motion to Dismiss.  (Doc. No. 44.)  On November 10, 2025, the

Court held a hearing on the Motion to Dismiss. [9]  (Doc. No. 50.)

The Motion to Dismiss the Complaint (Doc. No. 10) is now ripe for disposition.

## III.    STANDARD OF REVIEW

### A. The appropriate standard of review is under Federal Rule of Civil Procedure 12(b)(6)

As a threshold matter, the parties dispute the standard of review that applies here.  In the

Motion to Dismiss, Defendant contends that the correct standard to apply is Federal Rule of Civil

Procedure 12(b)(1), which provides that a party may assert a lack of subject-matter jurisdiction

as a defense.  (Doc. No. 17); Fed. R. Civ. P. 12(b)(1).  Defendant argues that because Plaintiff

already released the claims at issue here, the Court lacks subject matter jurisdiction in this case.

(Id. at 13–14.)  More specifically, Defendant points to a certain provision of the Settlement

Agreement between Plaintiff and Defendant, which provides

> **Releases.**
>
> (a) XOMA, on behalf of itself and its affiliates and subsidiaries and
>     the employees, officers, directors, agents, and representatives of
>     XOMA and its affiliates and subsidiaries, hereby completely and
>     irrevocably releases and forever discharges Janssen and its
>     affiliates and subsidiaries, the licensees, employees, officers,
>     directors, agents and representatives of Janssen and its affiliates
>     and subsidiaries, and all other parties against whom XOMA could
>     have asserted any claims in connection with the Dispute, from and
>     against any and all claims, counterclaims, liabilities, damages,
>     costs, losses and expenses (including attorney's fees and costs
>     actually incurred), of any nature whatsoever ("Claims"), whether
>     in law or in equity and whether known or unknown, which in
>     whole or in part relate to claims, allegations, defenses and issues

---

[9]    Additionally, at the November 10, 2025 hearing the Court granted Defendant's Motion to Stay Discovery (Doc. No. 11) and Defendant's Motion to Seal (Doc. No. 41).  (See Doc. Nos. 48, 49.)

which have been raised, could have been raised in , or relate to the
subject matter of the Dispute.

(Doc. No. 17-6, Ex. F § 3(a).)  The Settlement Agreement defines "Dispute" to mean any "actual,

and potential disputes, that either [Plaintiff or Defendant] has or may have against the other

arising under or relating to [a 2007 Non-Exclusive License Agreement] or [2002 Non-Exclusive

License Agreement]."  (Doc. No. 17-6, Ex. F.)  Thus, according to Defendant, the "have been

raised" language in Section 3(a) disposes of the instant case.  (Doc. No. 17 at 14.)

Conversely, Plaintiff argues that the correct standard of review at this stage of the

litigation is under Federal Rule of Civil Procedure 12(b)(6), which provides that a party may

assert a failure to state a claim upon which relief can be granted as a defense.  (Doc. No. 36);

Fed. R. Civ. P. 12(b)(6).  Plaintiff avers that the Defendant's attempt to resolve the instant matter

under Rule 12(b)(1) is a misbranded merits defense.  (Doc. No. 36 at 8.)  The Court agrees.

The legal standards that govern Rule 12(b)(1) and Rule 12(b)(6) are markedly different.

"At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'"  Petrsuka v.

Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006) (quoting Mortensen v. First Federal Sav. & Loan

Ass'n, 549 F.2d 884, 891 (3d Cir. 1997)).  Conversely, a Rule 12(b)(6) motion weighs the legal

sufficiency of a plaintiff's claim.  Id.  Under Rule 12(b)(1), a plaintiff bears the burden of

persuasion, whereas under Rule 12(b)(6), a defendant bears the burden to demonstrate no viable

claim has been stated.  Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

Plaintiffs may suffer prejudice if what, in actuality, is a Rule 12(b)(6) motion is treated as a Rule

12(b)(1) motion because when reviewing a Rule 12(b)(1) challenge, courts may weigh evidence

outside the pleadings—something otherwise impermissible under a Rule 12(b)(6) challenge.

Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., 836 F.3d 261, 268–69 (3d Cir. 2016).  Thus, a

Rule 12(b)(1) challenge can strip plaintiffs of the protections provided for through Rule 12(b)(6) review.  Id.

Here, the correct standard of review is under Rule 12(b)(6).  Despite Defendant's contention that the release ought to be considered under Rule 12(b)(1) because it strips the Court of subject matter jurisdiction, a release of claims is an affirmative defense.  I.K. ex rel. B.K. v. Sch. Dist. of Haverford Twp., 961 F. Supp. 674, 703 (E.D. Pa. 2013).  And, critically, proving an affirmative defense is Defendant's burden to bear.  Lupian v. Joseph Cory Holdings LLC, 905 F.3d 127, 130 (3d Cir. 2018).  To find otherwise would invert the burdens of persuasion which is inappropriate at the motion to dismiss stage of litigation.

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Iqbal, 556 U.S. at 678).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit

must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

## IV.    ANALYSIS

### A.  Defendant's Motion to Dismiss the Breach of Contract Claim Will Be Denied.

In Count I of the Complaint, Plaintiff alleges a Breach of Contract Claim against Defendant.  (Doc. No. 17 at 12–25.)  In the Motion to Dismiss, Defendant contends that Plaintiff's Claim for Breach of Contract fails because the express terms of the Master License Agreement

preclude it for three reasons: (1) Defendant did not breach the transfer restriction provision because the restrictions on transferred materials exist only upon a disposition of certain specified categories of materials, and the antibodies at issue were transferred under a license, (2) the contracts only prohibit manufacturing that uses Plaintiff's technology, and (3) the terms of the limitation-of-liability clause bar any relief sought by Plaintiff.  (Doc. No. 17 at 16–24.)

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'"  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001) (quoting Krizovensky v. Krizovensky, 425 Pa. Super. 204, 624 (1993)). [10]  Courts have a responsibility to evaluate, as a matter of law, whether contractual terms are clear or ambiguous.  Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F. 3d 69, 76 (3d Cir. 2011).  To make that determination, courts consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Id. (quoting Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001 (3d Cir. 1980)).   Contractual language is clear and unambiguous when it is susceptible to only one reasonable interpretation.  Bohelr-Uddenholm America, Inc., 247 F.3d at 79.  Thus, when contracts are unambiguous, courts will interpret their terms as a matter of law without reference to extrinsic evidence.  Rathblott v. PeopleStrategy, Inc., 685 Fed. App'x 107, 108 (3d Cir. 2017) (citing Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994)).   It logically follows, then, that when a contract is susceptible to more than one reasonable interpretation, it is ambiguous.  Bohler-Uddeholm America, Inc., 247 F.3d at 93.  Upon a determination that a contract is ambiguous, the fact-finder must ultimately resolve those

---

[10]   In accordance with the terms of the Centocor Agreement, it "shall be construed, interpreted, and applied in accordance with the laws of the state of Pennsylvania."  (Doc. No. 17-1, Ex. A § 10.6.)

ambiguities using, among other things, extrinsic evidence offered in support of the competing interpretations.  See Wulf v. Bank of America, N.A., 798 F. Supp. 2d 586, 592 (E.D. Pa. 2011). But, notably, at the motion to dismiss stage, the court may only look to the factual allegations set out in the complaint and construe them in favor of the nonmoving party.  Id.; Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018).

Here, the crux of the dispute between Plaintiff and Defendant lies within certain provisions of the Master Licensing Agreement and Centocor Agreement.  The Court will address each disputed provision seriatim.

**1. The Meaning of "Disposition" and "Transferred Materials" is ambiguous**

First, Plaintiff and Defendant advance two different interpretations of "Disposition" and its relationship to the bar on "Transferred Materials" under the terms of the Master Licensing Agreement between Plaintiff and MorphoSys.  The provisions at issue here read as follows:

> **1.5 <u>Dispose</u>** means to transfer, lease, or in any other fashion dispose of control, ownership or possession, but shall not mean to license or sell. "<u>Disposition</u>" shall have the correlative meaning.
>
> **2.4 <u>Transfer Restrictions</u>**. (a) MORPHOSYS shall not (i) undertake any Antibody Phage Display Activities on behalf of a Third Party or (ii) Dispose of Licensed Antibody Phage Display Materials, a Licensed Immunoglobulin, Licensed Immunoglobulin Information or the product of the practice of any method within the scope of the XOMA Patents ("<u>Transferred Materials</u>") to any Third Party until (in the case of either clause (i) or clause (ii)) such time as it has provided to such Third Party the redacted copy of this Agreement referred to in Section 4.2 and the form of notice set out at <u>Schedule 2.4</u>.
>
> (b) If MORPHOSYS enters into a written agreement with any Third Party arising out of or relating to activities as to which it or such Third Party does not or intends to claim the benefits of any of the licenses or other grants provided for by this Agreement, such written arrangement shall contain provisions (i) pursuant to which the recipient of any Transferred materials agrees to abide by each of the limitations, restrictions, and other obligations provided for by this

Agreement, including, without limitation, the restrictions on use of Transferred materials for purposes other than Research and Development; (ii) implementing a covenant not to use Transferred Materials for any purpose other than for Research and Development purposes otherwise authorized by this Agreement; (iii) providing that the "first sale" doctrine does not apply to any Disposition; and (iv) permitting a MORPHOSYS Collaborator to further Dispose of Transferred Materials only to a Third Party who otherwise meets the definition of a MORPHOSYS Collaborator and who executes a written agreement in which it undertakes all of the obligations applied to the transferring party. XOMA shall be, and the agreements subject to this Section 2.4[11] shall provide that XOMA shall be, an intended third-party beneficiary with respect to the foregoing provisions.

(Doc. No. 17-2 Ex. B §§ 1.5, 2.4(a)–(b).)

Defendant interprets the term "Disposition" in Section 1.5, supra, to exclude transfers made under a license. (Doc. No. 17 at 16.) In this regard, Defendant contends that because the antibodies at issue were provided to Defendant by MorphoSys under a license, it was not a "Disposition" and therefore the antibodies received by Defendant were not "Transferred Materials." (Id.) Thus, according to Defendant, the restrictions on commercialization, as opposed to research and development, within the Master Licensing Agreement are inapplicable to the antibodies Defendant ultimately developed to create Tremfya®. (Id.) Defendant further argues that because the antibodies used to create Tremfya® were not "Transferred Materials," the restrictions on Transferred Materials in Section 2.4(a), quoted above, have no application. (Id.)

Conversely, Plaintiff first asserts that the terms "Dispose of" or "Disposition" are not part of the definition of "Transferred Materials." (Doc. No. 36 at 20.) Rather, Plaintiff avers that the

---

[11]  Section 2.4 of the Master Licensing Agreement provides, in pertinent part, several restrictions on transfers of antibodies between MorphoSys and third parties on the use of Plaintiff's patented technology.

defined term "Transferred Materials" only refers to the four categories of materials that immediately precede it: (1) Licensed Antibody Phage Display Materials, (2) Licensed Immunoglobulin, (3) Licensed Immunoglobulin Information, or (4) the product of the practice of any method within the scope of the XOMA Patents.  (Id.)  Second, Plaintiff argues Defendant's interpretation of "Transferred Materials" is unreasonable because it would essentially eliminate the restriction on transfers and there would have been no reason to then include the same restrictions in Section 3.8(a) of the Centocor Agreement.[12]  (Id. at 21.)  Finally, Plaintiff asserts that even if "Dispose of" was part of the definition of "Transferred Materials," Defendant's argument nonetheless fails because it also depends on the contention that the transfer of materials to Centocor was "under a license" or "pursuant to a license."  (Id.)  However, Plaintiff points out that the Centocor Agreement only gives Defendant "the benefits of the covenant-not-to-sue" from Plaintiff—not a license.  (Id.)  Plaintiff notes that the difference between a license and a covenant not to sue is "only in form, not substance," and the parties, in line with industry practice, made distinct use of the two forms in their contractual obligations.  (Id.) (quoting TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1276 (3d Cir. 2009)).  Thus, it would be inapposite to believe Plaintiff and MorphoSys intended "license" in the definition of "Dispose" to include covenants-not-to-sue.  (Id. at 22.)

Here, the Court finds Plaintiff's interpretation of "Dispose" and "Transferred Materials" the most plausible at this stage.  From the language contained in Section 2.4(a) of the Master Licensing Agreement, it is reasonable to believe that "Dispose" or "Disposition" is not part of the

---

[12]  Section 3.8(a) of the Centocor Agreement provides, in pertinent part, that MorphoSys granted to Centocor the benefits of a covenant-not-to-sue between MorphoSys and Plaintiff's predecessor-in-interest, Xoma Ireland Limited.  The full text of Section 3.8(a) is provided infra.

definition of "Transferred Materials."  Rather, the meaning of "Transferred Materials" refers only to the four types of materials that precede the words "Transferred Materials" and not to the word "Dispose"—especially considering "Transferred Materials" first appears in Section 2.4(a) at the end of the list of covered materials and is set off in parentheses.  While it is possible that a fact-finder might find Defendant's interpretation more persuasive, at this stage of the litigation, when the language of the Master Licensing Agreement and the Centocor Agreement must be construed in the light most favorable to Plaintiff, the Court cannot conclude, as a matter of law, that there is only one reasonable interpretation of the meaning of the words "Dispose" and "Transferred Materials."

### 2.  The Centocor Agreement is ambiguous as to whether it permits commercialization.

Next, Plaintiff and Defendant proffer two different interpretations of certain provisions regarding restrictions on commercialization in the Centocor Agreement, the Master Licensing Agreement, as well as the Form of Notice, labeled as Schedule 2.4, and appended to the Master Licensing Agreement.

The provision of the Centocor Agreement at issue reads as follows:

**3.8 Third Party Covenants-Not-To-Sue**

> **(a) XOMA Covenant.** Subject to the limitations contained therein, MORPHOSYS hereby grants to CENTOCOR and those Affiliates agreeing to the requirements set forth in this Section 3.8(a) the benefits of the covenant-not-to-sue ("XOMA Covenant") under a license agreement between MORPHOSYS and XOMA IRELAND LIMITED ("XOMA License Agreement"), with regard to the "Patent Rights" listed in Schedule 1.17 of the XOMA License Agreement, to the extent necessary to permit CENTOCOR and such Affiliates to practice any licenses granted by MORPHOSYS to CENTOCOR hereunder. The benefits of the XOMA Covenant shall be personal to CENTOCOR and its Affiliates (as the case may be) and non-sublicensable or further conveyable, and shall not include the right to commercialize any products under XOMA's patent

17

rights. CENTOCOR and any Affiliate wishing to receive the benefits of the XOMA Covenant hereby acknowledge that each has read the redacted copy of the XOMA License that is appended hereto as Appendix 15.1, and CENTOCOR and any Affiliate wishing to benefit from the XOMA Covenant agree to abide by the provisions contained therein. In particular, CENTOCOR and such Affiliates agree that each shall abide by each of the provisions under Sections 2.4(b)(i) through 2.4(b)(iv) of the XOMA License Agreement, and CENTOCOR, its Affiliates and MORPHOSYS hereby agree that XOMA shall be an intended third party beneficiary with respect to such agreement to abide by such provisions. CENTOCOR acknowledges, on its own behalf and on behalf of its Affiliates, that the benefits under the XOMA Covenant are limited by the exclusions set forth in Section 2.3 of the XOMA License Agreement. CENTOCOR will notify MORPHOSYS of each Affiliate desiring access to the XOMA Covenant.

(Doc. No. 17-1 Ex. A. §3.8(a).)

Next, the provision at issue in the Master Licensing agreement provides as follows:

2.4 (b) If MORPHOSYS enters into a written arrangement with any Third Party arising out of or relating to activities to which it or such Third Party does or intends to claim the benefits of any licenses or other grants provided for by this Agreement, such written arrangement shall contain provisions (i) pursuant to which the recipient of any Transferred Materials agrees to abide by each of the limitations, restrictions, on use of Transferred Materials for purposes other than Research and Development purposes; (ii) implementing a covenant not to use Transferred Materials for any purpose other than for Research and Development purposes otherwise authorized by this Agreement; (iii) providing that the "first sale" doctrine does not apply to any Disposition and (iv) permitting a MORPHOSYS Collaborator to further dispose of Transferred Materials only to a Third Party who otherwise meets the definition of a MORPHOSYS Collaborator and who executes a written agreement in which it undertakes all of the obligations applied to the transferring party, XOMA shall be, and the agreements subject to this Section 2.4 shall provide that XOMA shall be, an intended third party beneficiary with respect to the foregoing provisions.

(Doc. No. 17-4 Ex. D § 2.4(b).)

Additionally, the parties dispute the meaning of the language in the Form of Notice set out in Schedule 2.4 which reads at length as follows:

> XOMA owns a number of patents covering various aspect of bacterial antibody expression and phage display.
> XOMA has licensed these patents on non-exclusive basis to MORPHOSYS.
> Under the license agreement with XOMA:

- MORPHOSYS cannot provide phage display services or transfer phage display materials, products or information to you without first showing you a redacted copy of its license from XOMA and this notice.
- If you and MORPHOSYS enter into a written agreement by which you become a "MORPHOSYS COLLABORATOR," then you will be permitted to use MORPHOSYS phage display services, MORPHOSYS phage display materials, products and information to research, develop and commercialize antibody products.
- Collaborators do not, however, have the right to produce commercial quantities of such antibodies using XOMA's patented technology. Rather, collaborators only have the right to make research and development quantities of antibodies using the XOMA patent rights. Thereafter, unless the collaborator obtains a commercial production license from XOMA (which may be available), the collaborator must produce commercial quantities of antibodies using a method that does not infringe XOMA patent rights.
- Therefore, if you and MORPHOSYS enter into a written agreement, that agreement must contain certain provisions specified in the license agreement with XOMA, including:
    - Terms pursuant to which you, as the recipient of any transferred materials, would agree to abide by each of the limitations, restrictions and other obligations provided for by the license agreement with XOMA, including without limitation, the restrictions on use of such transferred materials for purposes other than research and development.
    - A covenant not to use transferred materials for any purpose other than for research and development purposes otherwise authorized by the license agreement with XOMA.
    - A provision that the "first sale" doctrine does not apply to any disposition of transferred materials.
    - An agreement by you to further dispose of transferred materials only to a third party who otherwise meets the definition of a "MORPHOSYS Collaborator" set forth in the license agreement with XOMA and who executes a written

agreement in which it undertakes all of the obligations
applied to the transferring party.

The license agreement with XOMA contains many important terms,
including specific definitions of many of the words and phrases used
above, and you are urged to review the copy provided to you by
MORPHOSYS and discuss it with them before proceeding.

(Doc. No. 17-2, Ex. B Schedule 2.4.)

Defendant argues that these provisions, when read together, prohibit commercial
manufacturing only if it involves the use of Plaintiff's patented technology.  (Doc. No. 17 at 17.)
Defendant specifically highlights the second bullet point in Schedule 2.4 to support this argument.
Defendant interprets the second bullet point to mean that upon entering into a collaboration
agreement with MorphoSys, Defendant would be permitted to, among other things, commercialize
antibody products like Tremfya®.  (Doc. No. 17 at 17–18.)  Defendant further emphasizes the third
bullet point in Schedule 2.4, which it interprets to mean that absent a commercial production
license from Plaintiff, a collaborator could only produce commercial quantities of antibodies using
a method that does not infringe on Plaintiff's patent rights.  (Doc. No. 17 at 18.)  Put differently,
Defendant asserts that bullet points two and three of Schedule 2.4, taken together, mean that
Defendant was entitled to commercialize antibody products as a MorphoSys Collaborator because
it did not do so using a method that infringed on Plaintiff's patent rights.  (Id.)  Additionally,
Defendant contends that it did not use Plaintiff's patents to produce commercial quantities of
antibodies because Tremfya® uses mammalian cells, to which Plaintiff's bacterial cell expression
technology has no application.  (Id.)

Conversely, Plaintiff asserts that Defendant's interpretation conflates two distinct ideas: (1)
commercialization of an antibody, like Tremfya®, discovered using Plaintiff's BCE Technology
and (2) commercial production of an antibody using Plaintiff's BCE Technology.  (Doc. No. 36 at

23.)   Plaintiff argues that any commercialization or commercial production—whether using Plaintiff's patented technology or not—requires a commercial license, which is made clear in both the Master Licensing Agreement and the Centocor Agreement.  (Id.) (citing Doc. Nos. 17-1 Ex. A, § 3.8(a), 17-4 Ex. D §§ 1.13, 2.4(b)).  Further, Plaintiff submits that Defendant's interpretation of Schedule 2.4 is wrong for three reasons: (1) the language of the Centocor Agreement provides that Defendant's rights "shall not include the right to commercialize any products under XOMA's patent rights," (2) the "commercialize" language in Schedule 2.4 must be read in conjunction with the bar on Transferred Materials for purposes other than research and development, and (3) Schedule 2.4 makes clear that the Master Licensing Agreement controls.  (Doc. No. 36 at 23–24.) Similarly, Plaintiff maintains that Schedule 2.4 does not imply a right to commercialization without a license.  (Id. at 24.)  Instead, Schedule 2.4 should be read as wholly consistent with other provisions of the Master Licensing Agreement which make clear that any commercialization requires a license, but a license for commercial production is only required if Plaintiff's BCE Technology is used for production.  (Id.)

The parties proffered interpretations of commercialization across the various provisions of the Centocor Agreement, Master Licensing Agreement, and Schedule 2.4 show that the meaning of commercialization, and the conditions under which it is allowed, is ambiguous.  While Defendant's interpretation that commercialization is prohibited only if using Plaintiff's patented technology might persuade a trier of fact at trial, at the motion to dismiss stage it is not clear that a court can find it the only reasonable interpretation as a matter of law because Plaintiff's alternative interpretation is also plausible. When considered together, the various references to commercialization across the Centocor Agreement, the Master Licensing Agreement,[13] and

---

[13]   In their filings, both Plaintiff and Defendant point to other provisions in the Master

Schedule 2.4, could very well mean that any commercialization or commercial production requires a commercial license. Thus, the restrictions on commercialization referenced throughout the disputed provisions could lead reasonable minds to attach different meanings to it. Accordingly, Defendant's argument that the meaning of commercialization is unambiguous and is subject to only one interpretation fails.

### 3. Limitation of Liability Clause is ambiguous.

Finally, the parties dispute the implications of the Limitation on Liability Clause within the Centocor Agreement. That provision reads as follows:

> 10.4 **Liability.** NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY WILL BE LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILTIY OR OTHER LEGAL OR EQUITABLE THEORY FOR (I) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR LOST PROFITS OR (II) COST OF PROCUREMENT OF SUBSTITUTED GOODS, TECHNOLOGY OR SERVICES.

(Doc. No. 17-1, Ex. A § 10.4.)

Defendant argues that Plaintiff is bound by Section 10.4 of the Centocor Agreement because Plaintiff claims to be a third-party beneficiary and so its claims for royalties—which Defendant asserts are really claims for indirect and consequential damages—are thus barred by the plain language of Section 10.4.    (Doc. No. 17 at 21.)   Defendant asserts that the Centocor Agreement neither contemplated nor permitted any royalties to Plaintiff from Defendant.   (Id.) Further, Defendant contends that Plaintiff's demand for royalties rests on the contention that, at

_____

Licensing Agreement to support their respective arguments concerning what is the proper interpretation of commercialization.  (See Doc. No. 36 at 24; Doc. No. 17 at 19–20.) However, the Court need not discuss every provision in the Master Licensing Agreement because, as discussed above, there is sufficient ambiguity of the meaning of commercialization to warrant denying Defendant's Motion to Dismiss.

the time Defendant's commercialization of Tremfya® was imminent, Plaintiff and Defendant might have reached a separate agreement in which they could have agreed to the payment of royalties, which is, in effect, a claim for indirect and consequential damages. (Id.) Defendant also argues that Plaintiff's claims for royalties could be viewed as a claim for lost profits—which the plain language of Section 10.4 expressly precludes. (Id. at 23.) Thus, in sum, Defendant argues that Plaintiff's demand for past and future royalties based on Tremfya® sales is really a claim for indirect and consequential damages because it does not flow from a direct breach of the Centocor Agreement. (Id. at 22.)

Plaintiff, however, argues to the contrary that if the parties wanted to make Plaintiff subject to the Limitation of Liability Clause within Section 10.4, they could have done just that. (Doc. No. 26 at 26.) Instead, Plaintiff notes that the Centocor Agreement makes Plaintiff a third-party beneficiary with respect to Defendant's agreement to abide by the terms of Sections 2.4(b)(i)–(iv) of the Master Licensing Agreement—but makes no mention of the Limitation of Liability Clause. (Id.) Moreover, Plaintiff notes it never agreed to the terms of the Centocor Agreement, despite being a named third-party beneficiary. (Id.) Plaintiff further asserts that Defendant's interpretation of Section 10.4, would render the transfer restrictions—and Section 3.8(a) of the Centocor Agreement—illusory and unreasonable because it would eliminate any incentive for Defendant to honor its contractual obligations to Plaintiff. (Id. at 27.) Plaintiff also argues that, even assuming arguendo Section 10.4 did apply, the damages it seeks are neither consequential damages nor lost profits. (Id.) Instead, Plaintiff submits that royalties in this context are more appropriately characterized as an attempt to recoup the benefit of its bargain, which are considered direct damages. (Id.) (citing Jay Jala, LLC v. DDG Constr., Inc., No. 15-cv-3948, 2016 WL 6442074, at *5 (E.D. Pa. Nov. 1, 2016)). Alternatively, Plaintiff offers another possible interpretation of the

royalties sought: they are restitution damages and royalties in this context might be more appropriately categorized as restitution to restore the value of the benefit Plaintiff conferred on Defendant. (Id.)

Here, there is more than one plausible interpretation of the Limitation of Liability Clause in the Centocor Agreement. While the trier of fact could certainly interpret Section 10.4 of the Centocor Agreement to mean that Plaintiff is barred by the Limitation of Liability Clause contained therein, another plausible interpretation is that Limitation of Liability Clause is inapplicable to Plaintiff for two reasons: (1) Plaintiff was not privy to the terms of the Centocor Agreement until years after it was initially signed and (2) if the Limitation of Liability Clause did apply, Defendant could theoretically avoid its contractual obligations to Plaintiff without penalty. Both interpretations are plausible. Based on the factual allegations in the Complaint, the Court cannot—at this time—conclude as a matter of law that there is only one reasonable interpretation of the Limitation of Liability Clause.

Further, Defendant's contention that the damages sought by Plaintiff must be interpreted as lost profits fails for the same reason. The Court cannot conclude as a matter of law that there is but one reasonable interpretation of the type of damages Plaintiff seeks. On the contrary, Plaintiff's proffered interpretations regarding royalties are plausible. On the one hand, if the benefit of Plaintiff's bargain with MorphoSys and other third parties is to earn royalties through commercial licenses, then those could be direct damages as they flow directly from the contract itself. Jay Jala, LLC, 2016 WL 6442074, at *2. Alternatively, it is also a plausible interpretation for the royalties sought by Plaintiff to be viewed as restitution to recover the value of the benefit conferred on Defendant—namely, use of Plaintiff's BCE Technology that led to the discovery and subsequent commercialization of Tremfya®. Fishkin v. Susquehanna Partners, G.P., No. 03-cv-2766, 2007

WL 560703, at *4 (E.D. Pa. Feb. 12, 2007).  Again, because the parties are only at the motion to dismiss stage where the contracts are to be construed most favorably to Plaintiff, and because there is more than one plausible interpretation of the Limitation of Liability Clause and of the classification of royalties sought by Plaintiff, there is sufficient ambiguity in the Limitation of Liability Clause in Section 10.4 of the Centocor Agreement for Plaintiff's claims to survive.

### 4.  Plaintiff has plausibly alleged a Breach of Contract Claim

Under Pennsylvania law, to bring a claim for breach of contract, a plaintiff must demonstrate "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages."  Kaymark v. Bank of America, 783 F.3d 168, 182 (3d Cir. 2015) (quoting Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004)).

Despite Defendant's contentions that the language of the Master License Agreement precludes any breach of contract claim asserted by Plaintiff, as discussed supra, the Court finds that the disputed language of the Master License Agreement is ambiguous.  Moreover, to prevail at the motion to dismiss stage, Plaintiff need only plausibly allege the elements of a breach of contract claim.  Here, Plaintiff has satisfied this burden.  First, Plaintiff has plausibly alleged the existence of a valid, enforceable contract through the various provisions of both the Master Licensing Agreement and Centocor Agreement.  (Doc. No. 1 at ¶ 49.)  Second, Plaintiff has plausibly asserted a breach of a duty imposed by the contract in alleging that Defendant was precluded from commercializing any Transferred Materials under the terms of the Master License Agreement and Centocor Agreement.  (Id. at ¶¶ 50–58.)  Third, Plaintiff has plausibly alleged resultant damages in the form of royalties and compensatory damages.  (Id. at ¶ 59.)

For all these reasons, Defendant's Motion to Dismiss Plaintiff's Breach of Contract Claim will be denied.

### B.  Plaintiff has plausibly alleged, in the alternative, an Unjust Enrichment Claim.

Defendant also contends that Plaintiff is barred from claiming unjust enrichment because the contracts themselves govern.  (Doc. No. 17 at 24.)

To state a claim for unjust enrichment in Pennsylvania, a plaintiff must show (1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) it would be inequitable to allow the defendant to retain the benefit without rendering payment of value to the plaintiff.  Hickey v. Univ. of Pittsburgh, 81 F.4th 301, 316 (3d Cir. 2023).

But while it is true that Pennsylvania law bars an unjust enrichment claim when a contract—express or implied—governs the parties' relationship, Federal Rule of Civil Procedure 8(d)(3) permits this claim when either the existence or applicability of a contract is disputed: "a party may state as many separate claims or defenses as it has, regardless of consistency." Hickey 81 F.4th at 315–16 (quoting Fed. R. Civ. P. 8(d)(3)).  Critically, at the motion to dismiss stage, a plaintiff may plead inconsistent theories and seek alternative forms of relief.  Powers v. Lycoming Engines, Nos. 06-cv-2993; 06-cv-4228, 2007 WL 2702705, at *3 (E.D. Pa. Sept. 12, 2007).

Here, accepting the factual allegations set forth in the Complaint as true, the Complaint plausibly alleges the elements of a claim for unjust enrichment. First, Plaintiff alleges that it conferred a benefit on Defendant by contractually allowing Defendant to use Plaintiff's BCE Technology.  (Doc. No. 1 at ¶ 62.)  Second, Plaintiff plausibly alleges Defendant was aware of the benefit provided by Plaintiff, and Plaintiff's expectation of payment in return, because Defendant signed the Centocor Agreement.  (Id. at ¶ 64.)   Finally, Plaintiff has plausibly alleged it would be unjust for Defendant to retain the benefit conferred without receiving payment in exchange.  (Id.

at ¶¶ 65–67.)    Given that: (1) the parties dispute the applicability of the Master Licensing Agreement's terms, (2) Plaintiff plausibly alleged the elements of unjust enrichment, and (3) this case is at the motion to dismiss stage, it is permissible for Plaintiff to allege a claim for unjust enrichment in addition to breach of contract.    Thus, Defendant's Motion to Dismiss Plaintiff's claim for Unjust Enrichment will be denied.

### C. Plaintiff has Standing to assert Claims against Defendant.

Finally, Defendant argues that because the provisions of the Master Licensing Agreement at issue arise from an agreement between MorphoSys and Xoma Ireland Limited—to which neither Plaintiff nor its predecessor, Xoma Corporation is a party—Plaintiff lacks Article III standing to bring the claims asserted here.  (Doc. No. 17 at 12.)

It is a well-established principle that Article III standing is a constitutional minimum, requiring a plaintiff to establish (1) an injury in fact, (2) such injury is fairly traceable to the challenged conduct, and (3) a remedy that can redress that injury.  Road-Con, Inc. v. City of Philadelphia, 120 F.4th 346, 354 (3d Cir. 2024) (citing Uzuegbunam v. Preczewski, 592 U.S. 279, 285 (2021)).  Absent Article III standing, courts lack the power to hear the case or controversy.  Id.

Article III standing, however, is a distinct concept from contractual standing.  Becker v. Bank of N.Y. Mellon Trust Co., N.A., No. 11-cv-6460, 2012 WL 13013645, at *3 (E.D. Pa. Oct. 31, 2012); see also Aldossari on Behalf of Aldossari v. Ripp, 49 F.4th 236, 247 (3d Cir. 2022) (noting that there, the particular contractual standing issues asserted by the parties might not even implicate Article III standing at all); Maxim Crane Works, L.P. v. Zurich Am. Ins. Co., 11 F.4th 345, 350 (5th Cir. 2021) (highlighting that whether a party has a contractual right to bring suit does not go to the court's subject matter jurisdiction over the case, but rather is a merits argument); SM Kids, LLC v. Google LLC, 963 F.3d 206, 211 (2d Cir. 2020) ("Contractual standing is distinct from

Article III standing and does not implicate subject-matter jurisdiction.")  Instead, whether a party has contractual standing to bring suit is an issue decided on the merits under Federal Rule of Civil Procedure 12(b)(6).  <u>Becker</u>, 2012 WL 12013645, at * 3.

Here, Defendant insists Plaintiff lacks Article III standing to assert its breach of contract claim because neither Plaintiff, nor its predecessor, were parties to the provisions of the Master Licensing Agreement that Plaintiff relied upon in its breach of contract claim.  (Doc. No. 17 at 12.)  This is incorrect.  Whether Plaintiff has contractual standing to enforce certain provisions of the Master Licensing Agreement is a merits question, appropriately resolved under Rule 12(b)(6).  And, taking all the factual allegations within the Complaint as true, Plaintiff has adequately pled it has a contractual right to enforce provisions of the Centocor Agreement by virtue of the Tolling Agreement between Plaintiff and Defendant.   The plain language of the Tolling Agreement makes clear that XOMA Ireland Limited is Plaintiff's predecessor in interest: "XOMA (through its predecessor in interest XOMA Ireland Limited) …"  (Doc. No. 36-1 at 2.)  Given that Plaintiff relied on the Tolling Agreement in the Complaint to assert its claims, the Court concludes Plaintiff has plausibly alleged it has the contractual right to enforce provisions of the Centocor Agreement against Defendant.  Thus, Defendant's Motion to Dismiss for lack of standing will be denied.

## V.    CONCLUSION

For the foregoing reasons, and because there is sufficient ambiguity within the various disputed provisions of the Master Licensing Agreement and the Centocor Agreement, such that they are susceptible to more than one plausible interpretation, the Motion to Dismiss the Complaint (Doc. No. 10) will be denied.  An appropriate Order follows.